**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Mary DANN and Carrie Dann, Defendants-Appellants.**

**No. 77–1696.**

United States Court of Appeals, Ninth Circuit.

March 15, 1978.

John D. O'Connell, Salt Lake City, Utah, for defendants-appellants.

Robert L. Klarquist, Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before BROWNING and HUFSTEDLER, Circuit Judges, and BONSAL,* District Judge.

PER CURIAM.

The Danns, who are Western Shoshone Indians, appeal from a judgment in favor of the Government in an action brought by the Government for trespass. The Danns were charged with grazing their livestock on federal lands in the Elko Grazing District without a permit from the Bureau of Land Management. The Danns admitted that they had grazed the livestock on the lands, but they alleged that the Bureau lacked authority to exclude them because the lands were beneficially owned by the Danns and other members of the Western Shoshone Tribe. The Government and the Danns moved for summary judgment, and the district court granted the Government's motion. The district court held that collateral estoppel foreclosed the Danns from asserting that they had title to the lands because the Indian Claims Commission, in proceedings before the Commission on behalf of the Western Shoshone, had ruled that the lands had been acquired by the United States and that the Indians' title has been extinguished. The district court enjoined the Danns from grazing their livestock on the lands without proper federal authorization and assessed them $500.00 damages. This appeal followed.

Two issues are raised on appeal: (1) Are the Danns collaterally estopped from litigating the title of the Western Shoshone Tribe to the lands in question by the decision of the Indian Claims Commission; and (2) if the title issue is not precluded, do the Western Shoshone hold beneficial title to the lands? We hold that the proceedings before the Indian Claims Commission did not foreclose litigation of the title issue. We decline to reach the title question, and we remand the case to the district court for the purpose of deciding title.

* Honorable Dudley B. Bonsal, United States District Judge, Southern District of New York, sitting by designation.

A brief description of the factual background of this dispute is useful in understanding the nature of the issues which are presented before us. When the Treaty of Guadelupe-Hidalgo was signed in 1848, the Shoshone Nation used and occupied about 80 million acres of land, which now form parts of Idaho, Nevada, Utah, Colorado, and Wyoming. In northern and central Nevada, the Western Shoshone occupied 22 million acres of land. As non-Indian settlers moved across and settled in these areas, disputes erupted between the Indians and the non-Indians. In 1862, President Lincoln appointed a special commission to negotiate a peace treaty with the Shoshone. The commissioners were instructed specifically, on July 22, 1862, "that they were not expected to negotiate for the extinction of the Indian title but for the security of roads over the lands and 'a definite acknowledgement as well of the boundaries of the entire country that they [the Indians] claim.'" (*Northwestern Bands of Shoshone Indians v. United States,* 324 U.S. 335, 347, 65 S.Ct. 690, 696, 89 L.Ed. 985 (1945).) The commissioners eventually negotiated five treaties between July and October, 1863, with different Shoshone groups: Treaty of Fort Bridger with the Eastern Bands, Treaty of Box Elder with the Northwestern Bands, Treaty of Tuilla Valley with the Shoshone-Goship Bands, Treaty of Soda Springs with the Mixed Bands of Bannocks and Shoshone, and Treaty of Ruby Valley with the Western Bands. The only treaty directly involved in this case is the Treaty of Ruby Valley, signed October 1, 1863, and ratified as amended October 21, 1869 (18 Stat. 689).

Under the Treaty of Ruby Valley, the Western Shoshone agreed to the safe passage of white emigrants and travelers across their country, to the establishment of military posts and telegraph, overland stage and railway lines, and to the opening of their lands to prospecting, mining, farming, and ranching by whites. The Treaty also defined the boundaries of the Western Shoshone land, and provided that whenever the President "shall deem it expedient" to provide reservations for the Western Shoshone "within the country above described" the Indians would remove themselves to those reservations.

By 1872, about 20,000 non-Indians resided within the Shoshone tract. The increasing displacement of the Indian population led President Hayes to create a reservation for the Western Shoshone at Duck Valley. However, the Duck Valley Reservation was outside the Western Shoshone territory, and not "within the country above described" in the language of the Treaty of Ruby Valley. A small minority of Western Shoshone moved to the Duck Valley Reservation. As of 1973, the preponderance of the Western Shoshone people still lived within the tract described by the Treaty of Ruby Valley, which had been occupied by their ancestors a century earlier.

In 1945, Congress enacted the Indian Claim Commission Act (25 U.S.C. §§ 70, *et seq.*) which created the Commission ("ICC") to hear and decide claims brought upon behalf of the various Indian tribes against the United States, including "claims arising from the taking of the United States, whether as a result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without . . . payment . . . or compensation." (25 U.S.C. § 70a.) ICC decisions were reviewable by the Court of Claims. Upon the filing of the ICC's report with Congress, in which the Commission decides that the Indian claimants have a right to compensation, followed by congressional appropriation to pay the claim and the acceptance of that fund, the claimant's action is deemed finally determined and the claim itself deemed fully discharged by the United States. (25 U.S.C. § 70u.)

In 1951, various Shoshone tribes brought an action before the ICC claiming damages for the deprivation of their former tribal lands. (*Shoshone Tribe of Indians of the Wind River Reservation, Wyoming, et al. v. United States,* ICC Docket No. 326.) One of the co-petitioners in that proceeding is the Temoak Bands of Western Shoshone, who brought suit as the representative of the Western Shoshone. Paragraph 25 of that complaint charged that the United

States, in violation of the rights of the Western Shoshone and the provisions of the Treaty of Ruby Valley, "has disposed of a large part" of the land described in the Treaty of Ruby Valley "to settlers and others, or has seized and converted a large part of the said lands to its own use and benefit, without any compensation  . . . ." (*Quoted in Western Shoshone Identifiable Group v. United States,* 35 I.C.C. 457, 461–62 (1975).) The ICC in 1962 rendered an interlocutory decision in which the Commission said that the Western Shoshone constituted an identifiable group, that they had had exclusive use and occupation of, and, hence, aboriginal title to 22 million acres in Nevada, including the acreage involved in the present case. The ICC also noted that "the United States, without payment of compensation, acquired, controlled, or treated these lands as if they were public lands." (Finding 26, *Shoshone Tribe, supra,* 11 I.C.C. at 416.) A stipulation was entered in 1966 in which the parties agreed that July 1, 1872, would be deemed the date of taking for the purpose of valuation, and, in 1972, the Commission entered another interlocutory order setting the value of the land as of the stipulated date. (*Western Shoshone Identifiable Group v. United States,* 29 I.C.C. 5 (1972).)

In 1974, a group of Western Shoshone, including the Danns, who did not belong to the Temoak Bands, tried to intervene in the proceeding before the ICC, in order to remove from the pending claim certain lands, including those which are the subjects of this litigation. The ICC rejected the intervention petition, and that decision was affirmed by the Court of Claims. (*Western Shoshone Legal Defense & Education Ass'n v. United States,* 531 F.2d 495, 209 Ct.Cl. 43 (1976).) As the Court of Claims observed, the intervention effort sprang from an intertribal dispute among the Western Shoshone "over the proper strategy to follow in this litigation," *i. e.,* whether to claim that their lands had been taken by the United States and that substantial compensation was therefore due, or to insist that the lands had never been taken and are still owned by the Indians. (*See* 531 F.2d at 503.)

In November, 1976, the Temoak Bands changed course and adopted the position taken by the unsuccessful intervenors that Indian title to the lands described in the Treaty of Ruby Valley was retained by the Indians. They then sought recognition of their ownership, rather than money damages for the taking. The Temoak Bands petitioned the Secretary of the Interior in February, 1977, for an administrative determination that the Western Shoshone hold equitable title to the treaty lands. The Indians also requested the Commission to stay its proceedings pending the Secretary's determination. The Commission denied the request for a stay, and on August 15, 1977, the Commission announced the completion of proceedings before it and issued its final award. (40 I.C.C. 305.) The Indians appealed the denial of the stay to the Court of Claims, and the United States also filed an appeal. These appeals are still pending before the Court of Claims. The Secretary of the Interior has not thus far made a decision about the administrative determination of title.

The district court held that the 1962 order of the ICC, reported at 11 I.C.C. 387, estopped the Danns from asserting that the Indians retained beneficial ownership of the Western Shoshone's Nevada lands. On appeal, the Danns contend that the 1962 order is not entitled to any preclusive effect against them because (1) the Danns were not parties to the ICC action; (2) the order is not final; (3) the questions of title and taking were not actually litigated in the ICC action; and (4) the title issue involved in this case is not the same as the issue presented before the Commission. For the purposes of this appeal, we assume, without deciding, that the final judgments and orders of the ICC have preclusive effect under the doctrine of *res judicata.* However, even on that assumption, the doctrine does not foreclose litigation of the title issue in this case. The bar and merger aspects of *res judicata* are inapplicable because no final judgment has been entered. It is therefore unnecessary to resolve the question

whether the Danns were or were not "parties" to the ICC litigation by virtue of any representation of the Shoshone Tribes in the litigation.[1] Claims before the ICC proceed in three steps: decision whether the claimant Indians ever had title to the land for which they are seeking compensation; establishment of the value of the lands claimed to have been taken as of the time of taking; and a determination of any offsets against the Indians by the Government. The 1962 order of the ICC relied upon by the district court marked the conclusion of the first phase of the Western Shoshone litigation. This phase of the litigation before the Commission, however, is not deemed a final judgment within the meaning of the ICC Act. "Finality" for this purpose does not attach until the Commission has filed its final report with Congress and the Indians have actually been paid the compensation owed them. (25 U.S.C. § 70u.)[2]

The lack of finality of the 1962 ICC decision is underlined by the rationale of the Court of Claims in rejecting the Danns' right to intervene in the litigation. The court justified its affirming denial of intervention by noting that denial would not preclude a later effort by the Western Shoshone to reopen the question of title, even after the proceedings before the ICC had been completed. The court said:

> "It may . . . be noted that the bar of Section 22 does not fall until payment. . . . If the majority of the Identifia-

ble Group wishes to postpone payment, in order to try out the issue of current title, it can, of course, ask Congress to delay making the appropriation and direction which will be necessary to pay the award. . . . That course is still open if the majority of the Identifiable Group can be persuaded to follow it." (*Western Shoshone Legal Defense & Education Ass'n, supra,* 531 F.2d at 503 n.16.)

Of equal importance from the standpoint of collateral estoppel [issue preclusion], the title issue in this case was neither actually litigated nor actually decided in the proceedings before the ICC. The key question in this case is not whether the Indians had title, but whether the title that they had was in any way extinguished by the Government. The extinguishment question was not placed in issue in the litigation before the ICC. The title phase of the litigation before the ICC determines whether the Indians ever had aboriginal title before the arrival of the white man, not whether title thereafter had passed to the United States. As the Court of Claims observed in its analysis of the title phase of the Western Shoshone suit, "the Government consistently maintained that the Indians never owned the lands they claimed and therefore that the question of title-extinction never arose." (531 F.2d at 500.) Whatever may have been the implicit assumptions of both the United States and the Shoshone Tribes during the litigation before the ICC, the extinguishment ques-

1. Some difficult issues are presented in deciding the identity of parties question in the context of tribal litigation before the Commission. (*See Fort Sill Apache Tribe v. United States,* 477 F.2d 1360, 1362, 201 Ct.Cl. 630 (1973); *Cherokee Freedmen v. United States,* 161 Ct.Cl. 787 (1963). *See also Western Shoshone Legal Defense & Educ. Ass'n v. United States, supra,* 531 F.2d 495, 209 Ct.Cl. 43.)

2. The title phase of a decision by the ICC is not a final order. (*Caddo Tribe of Oklahoma v. United States,* 155 F.Supp. 727, 140 Ct.Cl. 63 (1957).) *Caddo* arose in the context of an attempt to appeal a title-phase decision. Although *Caddo* was directly concerned with the question of finality only for the purpose of determining appealability, the *Caddo* court also commented on the issue preclusion question:

"Under the circumstances, the views of the Indian Claims Commission, expressed in the order appealed from, have not yet assumed finality, and, until final judgment is entered disposing of the entire proceeding, the Commission is at liberty to alter the views therein expressed. Accordingly, there can arise no problem of estoppel by judgment [issue preclusion] for either party." (155 F.Supp. at 738.)

Although the ICC Act was amended in 1960 to preclude appeals of interlocutory determinations establishing liability, the Court of Claims has since held that *Caddo's* analysis of "what constitutes a final decision within the context of the . . . Act" is still applicable. (*Seminole Indians of Florida v. United States,* 471 F.2d 614, 615, 200 Ct.Cl. 417 (1973).)

tion was not necessarily in issue, it was not actually litigated, and it has not been decided.[3]

The judgment is reversed and the cause is remanded to the district court for further proceedings consistent with the views herein expressed.

3. The Temoak Bands, in their *amicus* brief, contend that the voluntary selection of a compensation strategy and rejection of a title recognition strategy, described by the Court of Claims (531 F.2d at 503), never took place. They argue that at the time they brought their action before the ICC and for 25 years thereafter, they had no taking/title choice because they could not have sued the Government for recognition of their title claims. They argue that the ICC had no jurisdiction to quiet title, and quiet title relief was not otherwise available to the Western Shoshone because the United States had not yielded its immunity from suit for this purpose. (*See, e. g., Malone v. Bowdoin,* 369 U.S. 643, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962).) The Temoak Bands contend that an election of remedies did not become possible until the fall of 1976, when Congress amended the Administrative Procedure Act to waive sovereign immunity to suits seeking equitable and declaratory relief for unlawful official actions. (5 U.S.C. §§ 702, 703.) Until the amendment, the Western Shoshone could seek only administrative or judicial relief on the theory that their ownership had never been extinguished and that government officials were unlawfully treating their lands as "public lands." A month after the amendment, the Temoak Bands moved for a stay in the ICC proceedings in order to petition the Secretary of the Interior for administrative determination of their rights. The Temoak Bands' contention is supported by *United States v. Creek Nation,* 427 F.2d 743, 745–48, 192 Ct.Čl. 425 (1970). We need not and do not decide the contentions of the Temoak Bands at this juncture because it is unnecessary to the rendition of this decision. We mention the argument because it emphasizes the legal difficulties of the Government's contention that the collateral estoppel doctrine should be applied to foreclose the Danns from litigating the extinguishment issue. (Restatement of Judgments 2d § 68.1(b)(ii).)