**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Mary DANN and Carrie Dann,
Defendants-Appellants.**

**Nos. 80–4298, 80–4345.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 13, 1982.

Decided May 19, 1983.

---

Dean K. Dunsmore, Washington, D.C., B. Mahlon Brown, U.S. Atty., Shirley Smith, Asst. U.S. Atty., Reno, Nev., for plaintiff-appellee.

John D. O'Connell, O'Connell & Yengich, Salt Lake City, Utah, for defendants-appellants.

Before FLETCHER, POOLE, and CANBY, Circuit Judges.

CANBY, Circuit Judge:

In 1974, the United States filed this trespass action against Mary Dann and Carrie Dann, alleging that the Danns were grazing their livestock on nine sections of public land without a permit, in violation of the Taylor Grazing Act, 43 U.S.C. § 315 et seq. (1976), and the regulations issued pursuant to it, 43 C.F.R. pt. 4100 (1981). The Danns defended primarily on the ground

that they were Western Shoshone Indians and that they, along with others of that group, still retained aboriginal title to the land in issue. Aboriginal title is a right of occupancy arising from exclusive aboriginal possession of land, and it is valid against all parties until it is "extinguished" by the United States. *See Johnson v. McIntosh,* 21 U.S. (8 Wheat.) 543, 587, 5 L.Ed. 681 (1823); *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 669, 94 S.Ct. 772, 778, 39 L.Ed.2d 73 (1974).[1]

The government countered this defense with the arguments that any title that the Western Shoshone ever had to the land in question had been extinguished, and that this fact had been conclusively established in proceedings brought before the Indian Claims Commission (ICC or Commission) on behalf of the Western Shoshone. In 1975, the district court accepted the government's collateral estoppel argument and granted summary judgment against the Danns. This court reversed and remanded to the district court in *United States v. Dann,* 572 F.2d 222 (9th Cir.1978) (per curiam) (*Dann I*). We held that collateral estoppel did not preclude litigation of the issue of extinguishment of title, because that question was "neither actually litigated nor actually decided in the proceedings before the ICC." *Id.* at 226. We further held that neither collateral estoppel nor res judicata (claim preclusion) could be applied because no final judgment had been entered in the claim proceedings, and that " '[f]inality' for this purpose does not attach until the Commission has filed its final report with Congress and the Indians have actually been paid the compensation owed them. (25 U.S.C. § 70u.)" *Id.* (footnote omitted).

Our opinion in *Dann I* fully set forth the background of this trespass action, as well as that of the Western Shoshone's suit before the Commission, but we will briefly restate the facts here. In 1951, the Western Shoshone made a claim against the United States under clause 4, section 2 of the Indian Claims Commission Act, 25 U.S.C. § 70a (1976).[2] The claim was based on the United States' having taken a vast expanse of Western Shoshone land in Nevada and California. The claim was prosecuted by the Temoak Band on behalf of the Western Shoshone identifiable group.

In 1974, a group of Western Shoshone, including the Danns, attempted to intervene in the ICC proceedings to remove from the pending claim certain lands, including those that are the subject of the present trespass action. The ICC rejected the intervention, and that ruling was affirmed by the Court of Claims, which viewed the attempted intervention as an intratribal disagreement over the proper litigation strategy. *Western Shoshone Legal Defense & Education Ass'n v. United States,* 531 F.2d 495 (Ct.Cl.), *cert. denied,* 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976). In 1976, however, the Temoak Band itself reversed its prior posture and sought to stay the claim proceedings in order to seek an administrative declaration that the Western Shoshone still had title to approximately 12 million acres that they originally had claimed to have been taken. According to the Temoak Band, its original decision to pursue the claim did not constitute an election of remedies because there was no way

---

1. An extinguishment of aboriginal title by the United States does not give rise to a right of compensation under the Fifth Amendment. *Tee-Hit-Ton Indians v. United States,* 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314 (1955). In this respect, aboriginal title differs from "recognized title" that may result from treaty or statute. Taking of recognized title is compensable. *United States v. Creek Nation,* 295 U.S. 103, 109–111, 55 S.Ct. 681, 683–684, 79 L.Ed. 1331 (1935).

   The Danns originally claimed recognized title as well, but have since abandoned that claim

and now depend solely on their claim of aboriginal title.

2. Section 2 of the Act, 25 U.S.C. § 70a, authorizes claims to be brought on behalf of "any Indian tribe, band, or other identifiable group of American Indians" for various matters, including:

   "(4) claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant...."

that the Band could then have pursued the alternative of establishing its present title to the lands; the Indian Claims Commission had no jurisdiction to quiet title in the Western Shoshone, and neither equitable nor declaratory relief was otherwise available against the government until 1976. *See Dann I,* 572 F.2d at 227 n. 3. The Commission denied the motion to stay its proceedings and entered its final award. The Temoak Band appealed the award to the Court of Claims, and the only error urged on appeal was the Commission's denial of that stay. The appeal was still pending before the Court of Claims at the time of our decision in *Dann I.*

After our decision in *Dann I,* the Court of Claims affirmed the award. *Temoak Band of Western Shoshone Indians v. United States,* 593 F.2d 994 (Ct.Cl.), *cert. denied,* 444 U.S. 973, 100 S.Ct. 469, 62 L.Ed.2d 389 (1979). It held that the stay had been properly denied because the Commission proceedings had lasted many years, and the motion for stay came too late for such a major change in litigation strategy. *Id.* at 998–99. The court added: "we think it is only Congress that could stay and undo the course of litigation. . . . The essential point of the matter is that the Temoak's true appeal is to legislative grace, not as of right to this court." *Id.* at 999. As the Supreme Court subsequently denied certiorari, no further judicial review of the award is available. *See* 25 U.S.C. § 70s. Accordingly, in 1979, the Clerk of the Court of Claims certified the award to the General Accounting Office.

Informed of these developments, the district court in the present action rendered the decision now before us. The district court agreed with the government that, upon certification of the Commission award, the award was "automatically paid" and was therefore "final for purposes of res judicata and collateral estoppel." It further held that the effect of the award was to extinguish aboriginal Indian title to these Western Shoshone lands as of the date when the award was certified to the General Accounting Office, and that before that date title had not been extinguished.

The district court accordingly issued an injunction against further trespasses by the Danns, but denied damages for previous trespasses, which had preceded the certification of the claims award. Both sides appeal the district court's judgment. We reverse the judgment granting the injunction and remand for further proceedings.

### Collateral Estoppel (Issue Preclusion) and Res Judicata (Claim Preclusion)

The government does not at this juncture dispute the fact that the Western Shoshone at one time held aboriginal title to the lands in question here. It contends, however, that. the issue of extinguishment of that title was actually litigated in the claim proceedings and that the Commission decided that title had been extinguished. The district court was therefore correct, according to the government, in ruling that the Danns were estopped from asserting aboriginal title. The difficulty with this argument is that it runs directly counter to our ruling in *Dann I.* We held there that "the title issue in this case was neither actually litigated nor actually decided in the proceedings before the ICC." 572 F.2d at 226. We pointed out that in the claim proceedings, " 'the Government consistently maintained that the Indians never owned the lands they claimed and therefore that the question of title-extinction never arose.' " *Id.* at 226 (quoting *Western Shoshone Legal Defense & Education Ass'n v. United States,* 531 F.2d at 500). We concluded that because the extinguishment of title issue had not actually been litigated, the Danns were not collaterally estopped from raising the title defense in the present proceedings.

■ Our holding in *Dann I* is the law of the case and we must follow it "unless the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice." *Kimball v. Callahan,* 590 F.2d 768, 771–72 (9th Cir.), *cert. denied,* 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979)

(quoting *White v. Murtha,* 377 F.2d 428, 431–32 (5th Cir.1967)); *Moore v. Jas. H. Matthews & Co.,* 682 F.2d 830, 833–35 (9th Cir.1982); *see Handi Investment Co. v. Mobil Oil Corp.,* 653 F.2d 391, 392–93 (9th Cir.1981); *Adamian v. Lombardi,* 608 F.2d 1224, 1228 (9th Cir.1979), *cert. denied,* 446 U.S. 938, 100 S.Ct. 2158, 64 L.Ed.2d 791 (1980).

■ There has been neither a change in the nature of the evidence nor a controlling intervening decision. The government contends, however, that the collateral estoppel ruling of *Dann I* was clearly erroneous. We do not believe that it was. It is true that the Temoak Band asserted in the claim proceedings that there had been an extinguishment of title by taking, and that the claims award necessarily rests upon such a taking.[3] But the extinguishment was not denied by the government, and the fact of the taking consequently was never actually litigated. Because an average "taking date" was stipulated, the Commission did not determine the facts of taking for any individual parcel of the vast aboriginal holdings of the Western Shoshone. Under these circumstances, issue preclusion is inappropriate. Restatement (Second) of Judgments § 27 comment e (1982); *see Sekaquaptewa v. MacDonald,* 575 F.2d 239, 246–47 (9th Cir.1978). We therefore adhere to our ruling in *Dann I* that the Danns are not collaterally estopped by the claims decision from asserting aboriginal title here.

The government next contends that, apart from its collateral estoppel effect, the claims award operates by way of bar or merger to preclude the entire title claim of the Danns, under the provisions of the Indian Claims Act and the doctrine of res judicata. The applicable provision of the Act is 25 U.S.C. § 70u, which provides:

70u. Payment of claim after final determination; adverse determination as bar to further claims

(a) When the report of the Commission determining any claimant to be entitled to recover has been filed with Congress, such report shall have the effect of a final judgment of the Court of Claims, and there is authorized to be appropriated such sums as are necessary to pay the final determination of the Commission.

*The payment of any claim, after its determination in accordance with this chapter, shall be a full discharge of the United States of all claims and demands touching any of the matters involved in the controversy.*

(b) A final determination against a claimant made and reported in accordance with this chapter shall forever bar any further claim or demand against the United States arising out of the matter involved in the controversy.

(emphasis added).

■ We disagree with the government's contention that the bar provisions of the statute are not exclusive, and that an additional bar may arise from common law principles of res judicata. It is true that the first paragraph of subsection (a) states that a report favorable to a claimant that is filed with Congress "shall have the effect of a final judgment of the Court of Claims." In context, however, that statement appears to refer to the effect of the report on the legislative authorization and appropriation process and not to its collateral effect upon other proceedings. We think that the specific provisions of the second paragraph of subsection (a), that impose a bar upon *payment* of the claim, set forth the entire bar effect of a favorable claim determination and implicitly exclude others. Indian claims proceedings are highly extraordinary creatures of statute. In the absence of a recognized tribal organization, they may be brought by any member of an identifiable group of Indians on behalf of all members. 25 U.S.C. § 70i (1976). There is no provision for members to opt out of the proceedings, as there is in the case of class actions

---

**3.** In *Dann I* we found it unnecessary to decide whether the Danns were in privity with the claimants in the claim proceedings, because we gave the claims award no collateral estoppel or

res judicata effect. 572 F.2d at 226 & n. 1. We again decline to decide the question of identity or privity of parties, for the same reason.

under Fed.R.Civ.Proc. 23(c)(2). Congress was careful to delineate the manner in which the judgments reached in these unusual proceedings would be effectuated. We are reluctant to add to the statutory sanctions. We conclude, therefore, that the bar arising from a favorable claim determination takes effect upon the payment of the claim, pursuant to section 70u(a). We decline to find any common law res judicata bar effect arising before that time.[4] Had Congress expected claims determinations to be governed by non-statutory principles of res judicata, it would have found no need to specify in subsection (a) that a bar arises from a favorable determination upon payment, and to specify in subsection (b) that a bar arises from a determination adverse to a claimant upon the filing of the unfavorable report with Congress.

Our conclusion that the bar arises only upon payment of the claim simply repeats what we stated in *Dann I. Dann I* was decided before the report of the Commission was filed with Congress. In denying claim preclusion for lack of finality of the award, however, we stated:

> "Finality" for [the purpose of the ICC Act] does not attach until the Commission has filed its final report with Congress *and the Indians have actually been paid the compensation owed them.* (25 U.S.C. § 70u.)

4. Our decision that the statutory bar provision is exclusive renders it unnecessary to determine whether other requirements of common law res judicata are met. In particular, we do not decide whether the Danns' defense in this trespass action is the same "claim" as that involved in the ICC proceedings. The district court, in its first summary judgment order of January 4, 1976, stated that it was unable to conclude that the claims were substantially identical.

5. We acknowledge that the Danns did not contest in the district court the government's assertion that payment was now "automatic". The government first raised this "automatic payment" argument in its third supplemental memorandum to the district court, long after the district court had taken the parties' cross-motions for summary judgment under advisement. Normally an appellant may not present arguments in this court that it did not properly

572 F.2d at 226 (footnote omitted) (emphasis added).

*Has the Claim been Paid?*

The government contends that the claim has been paid, bringing into effect the bar of section 70u(a). It points out that the final award was certified by the Clerk of the Court of Claims to the General Accounting Office, and that funds were thereupon automatically appropriated pursuant to 31 U.S.C. § 724a (Supp. III 1979).[5] The amount of the award has been credited to a Treasury account for the benefit of the Western Shoshone. The government argues that these actions are more than sufficient to constitute "payment" within the meaning of section 70u(a) and *Dann I.* The issue is not resolved by *United States v. Gemmill,* 535 F.2d 1145, 1149 (9th Cir.), *cert. denied,* 429 U.S. 982, 97 S.Ct. 496, 50 L.Ed.2d 591 (1976), where we ruled that payment of a claim removed any ambiguity that title had previously been extinguished, but where we left unclear whether appropriation amounted to payment. While the question is a close one, we conclude that "payment" has not been shown to have occurred in this case, and that the bar provision of section 70u(a) does not preclude the Danns from asserting aboriginal title.

Although funds have been appropriated and credited to an interest-bearing Treasury account in the name of the Tribe,

raise below, *Rothman v. Hospital Service of Southern California,* 510 F.2d 956, 960 (9th Cir.1975), but application of that rule is discretionary. *Singleton v. Wulff,* 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976). It is well settled in this circuit that where the new issue is purely a legal one, the injection of which would not have caused the parties to develop new or different facts, we may resolve it on appeal. *Telco Leasing, Inc. v. Transwestern Title Co.,* 630 F.2d 691, 693 (9th Cir.1980); *Hansen v. Morgan,* 582 F.2d 1214, 1217–18 (9th Cir.1978); *United States v. Patrin,* 575 F.2d 708, 712 (9th Cir.1978). The question here is purely one of statutory construction that is both central to this case and important to the public. We excuse the Danns' failure to respond to a legal assertion contained in a supplemental memorandum advising the district court of post-submission events.

no monies have actually passed into the hands of the Western Shoshone group or its members, nor have any been used for their benefit. Distribution and use of the awarded funds can only take place pursuant to a plan of use or distribution timely prepared by the Secretary of Interior and acquiesced in by Congress, 25 U.S.C. §§ 1401–07, or by separate legislation. We are advised that in the present case no timely plan was submitted, so that separate legislation will be required. Congress therefore retains significant control over the claims process until the distribution scheme is actually put into effect. We conclude that "payment" has not occurred within the meaning of section 70u(a) until Congress has taken its final look at the award and has either permitted a plan of distribution to become effective pursuant to 25 U.S.C. § 1403 or has legislated one. One reason for so concluding is that the ordinary meaning of "payment" does not seem satisfied by a transfer of funds that leaves such significant legal blocks in the way of delivery to the payee. Other reasons have to do with the interpretation of section 70u offered by the Court of Claims in *Western Shoshone Legal Defense and Education Ass'n v. United States,* 531 F.2d 495 (Ct.Cl.1976), and with certain changes in the claims appropriation process thereafter made by Congress.

As we have already related, the Danns and others attempted to intervene in the Western Shoshone claims litigation in 1974. The intervenors sought to withdraw from the claim certain lands, including those at issue here, on the ground that the Western Shoshone still retained unextinguished aboriginal title to those lands. In affirming the denial of intervention, the Court of Claims ruled that the would-be intervenors were simply disagreeing belatedly over the litigation strategy permissibly adopted by the Temoak Band, which had brought the claim on behalf of the Western Shoshone. *Id.* at 503. The Court of Claims stated that the intervenors had failed to substantiate their assertions that a majority of the Western Shoshone group agreed not to include the disputed lands in the claim. *Id.* In response to the intervenors' fears that

the issue of title might be foreclosed by the claim proceedings, the Court of Claims observed:

> It may also be noted that the bar of Section 22 [section 70u] does not fall until payment. . . . If the majority of the Identifiable Group wishes to postpone payment, in order to try out the issue of current title, it can, of course, ask Congress to delay making the appropriation and direction which will be necessary to pay the award. *Cf. Turtle Mountain Band of Chippewa Indians v. United States,* 490 F.2d 935, 951–53, 203 Ct.Cl. 426, 454–56 (1974). That course is still open if the majority of the Identifiable Group can be persuaded to follow it.

*Id.* at 503 n. 16. This language of the Court of Claims was quoted and relied upon by this court in *Dann I,* 572 F.2d at 226. In refusing to give estoppel or bar effect to the non-final claim determination, we concluded that finality does not attach until the Indians actually have received payment. *Id.*

At the time that the Court of Claims dealt with the Danns' attempted intervention, Congress was required to pass an appropriation in satisfaction of each certified Indian claims award. Thus, if a majority of the Identifiable Group wished to appeal to Congress to modify the terms of the award, it could do so at the appropriation stage. In 1978, however, Congress amended the standing appropriations act, 31 U.S.C. § 724a, to include Indian claims awards. Thereafter, no separate appropriation by Congress was required. It was no longer feasible, therefore, for a majority of the Identifiable Group to follow the suggestion of the Court of Claims and ask Congress "to delay making the appropriation" in order to litigate title. We do not conclude, however, that Congress by its change in the appropriation process intended to yield its final authority to affect the nature of an award before it acquires bar effect under section 70u. Congress's purpose in amending the standing appropriations act was simply "to reduce the workload of an unnecessary and strictly routine legislative step." House

Comm. on Appropriations, Report on Supplemental Appropriations Bill of 1978, H.R. Rep. No. 644, 95th Cong., 1st Sess. 53 (1977). Congress still retained its oversight of the use or distribution of the award. It also provided for input from affected Indians in the preparation of a distribution plan. 25 U.S.C. § 1403 (Supp. III 1979). It therefore accords with the purpose of Congress, as well as the suggestion of the Court of Claims, to forestall the bar effect of an award when Congress delays the "appropriation and direction which will be necessary to pay the award." *See Western Shoshone,* 531 F.2d at 503 n. 16.

It is true that in a subsequent opinion the Court of Claims used language that seems to point in a different direction. The occasion was an appeal that arose because, subsequent to our opinion in *Dann I,* the Temoak Band itself concluded that it had been pursuing the wrong claims strategy and asked the Commission to stay the claims proceedings. The Commission refused, and the Court of Claims affirmed. *Temoak Band of Western Shoshone Indians v. United States,* 593 F.2d 994 (Ct.Cl.), *cert. denied,* 444 U.S. 973, 100 S.Ct. 469, 62 L.Ed.2d 389 (1979). The court emphasized the tardiness of the proposed shift in strategy, and stated that if the Indians wished "to avert extinguishment of their land claims by final payment, they should go to Congress as recommended in *Western Shoshone. . . ."* *Id.* at 999. The court added:

> The matter is somewhat changed since the *Western Shoshone* footnote because Congress can no longer stop the payment and defer the extinguishment of the title claim, just by not appropriating. . . . Thus it looks as if the Temoaks would have to get Congress to act affirmatively. In view of its plenary power over Indian tribal property, . . . we have no doubt that even after payment its action could be effective. And we think it is only Congress that could stay and undo the course of litigation at this late date, and if anybody should, it is only Congress.

*Id.* While this language does suggest that payment might take place in the absence of congressional action, it also clearly acknowledges the possibility of congressional intervention to permit collateral pursuit of the Western Shoshone claims to continuing aboriginal title. We think that this channel of congressional relief is best kept open by an interpretation of section 70u that does not bar collateral litigation, which might produce results highly informative to Congress in making its decision, until Congress has exercised its final discretion in dealing with the claim itself. Such an interpretation is not inconsistent with the actual holding of *Temoak Band* that the claims proceedings themselves ought not to be stayed for such collateral determinations. That holding simply requires that the award be made and that the issue of further proceedings be left up to Congress. Under our interpretation of section 70u, the Temoaks can avert loss of existing title by asking Congress to delay, just as the Court of Claims originally told them they could.[6] Congress can then permit collateral litigation or invoke the bar of section 70u by allowing a plan of use or distribution to take effect or by legislating one.

We therefore conclude that "payment" of the Western Shoshone claim has not occurred within the meaning of 25 U.S.C. § 70u(a), and that the Danns are not precluded by that statute from asserting aboriginal title as a defense to this trespass action.

### *Extinguishment of Title as a Matter of Law*

The district court, in rendering judgment based on the res judicata effect of the claims award, held that the effect of the award was to extinguish aboriginal Indian title to the lands in question, and that "[u]ntil the Indian Claims Commission judgment became final, such aboriginal Indian

---

**6.** Nor is our interpretation of section 70u(a) inconsistent with the holding of *Six Nations Confederacy v. Andrus,* 447 F.Supp. 40 (D.D.C. 1977), *aff'd,* 610 F.2d 996 (D.C.Cir.1979), *cert.* *denied,* 447 U.S. 922, 100 S.Ct. 3013, 65 L.Ed.2d 1114 (1980). There the bar of section 70u(a) was given effect, but Congress had permitted a plan of distribution to go into effect.

title had not been extinguished." Because the district court viewed the claims award as becoming final on December 6, 1979, well after the complaint for trespass had been filed, it dismissed the government's claim for damages but granted the requested injunction.

█ For reasons already stated, the district court erred in giving conclusive effect to the claims award. Even if the claims award had been entitled to conclusive effect, however, it could not result in the extinguishment of aboriginal title on the date the award became final. It was not within the jurisdiction of the Indian Claims Commission to extinguish Indian title on its own authority, nor did the Commission purport to exercise such jurisdiction. The ICC only had the power to award compensation for claims arising on or before August 13, 1946, whether those claims arose from the taking of aboriginal title or other action of the United States. 25 U.S.C. § 70a.

█ Having concluded that the ruling of the district court regarding the res judicata effect of the claims award must be set aside, we are left with the district court's unelaborated conclusion that aboriginal title to the lands had not been extinguished prior to December 6, 1979. The government argues that the conclusion is erroneous because various acts of the United States over the past century have caused an extinguishment of the Western Shoshone aboriginal title to the lands in issue. Extinguishment may be accomplished "by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise." *United States v. Santa Fe Pacific R.R.,* 314 U.S. 339, 347, 62 S.Ct. 248, 252, 86 L.Ed. 260 (1941). The intent must be clear, however; "an extinguishment cannot be lightly implied." *Id.* at 354, 62 S.Ct. at 255. The actions that the government claims to have caused extinguishment are the following: (1) application of the public land laws, including the homestead laws, to the lands aboriginally held by the Western Shoshone; (2) creation

of the Duck Valley Reservation for the Western Shoshone; and (3) administration of the lands pursuant to the Taylor Grazing Act for over 45 years. We will take these points in order, but first must address some threshold considerations.

The lands aboriginally held by the Western Shoshone were incorporated into the United States from Mexico by the Treaty of Guadalupe Hidalgo, 9 Stat. 922 (1848). That treaty did not deal unequivocally with the subject of aboriginal title; it guaranteed property rights of Mexican citizens within the yielded territories,[7] and also provided that in removing Indians or opening their lands to settlement, the United States should take care that those actions not cause the Indians to invade Mexico. *Id.* at 929–32. The Supreme Court subsequently made it clear, however, that Indian rights of occupancy survived the transfer of territory from Mexico. *Santa Fe Pacific,* 314 U.S. at 345–46, 62 S.Ct. at 251. It also made clear the fact that Congress could extinguish such aboriginal title without raising any justiciable issue, because "[t]he power of Congress in that regard is supreme." *Id.* at 347, 62 S.Ct. at 252.

█ The Danns contend that the power of Congress is not only supreme, but exclusive, and that mere executive action can never extinguish aboriginal title. We agree that executive action wholly unauthorized by Congress could not effect an extinguishment. *See Cramer v. United States,* 261 U.S. 219, 234, 43 S.Ct. 342, 346, 67 L.Ed. 622 (1923); *United States v. Southern Pacific Transp. Co.,* 543 F.2d 676, 689 (9th Cir.1976). The government argues, however, that extinguishment can result from executive action taken pursuant to general operating authority granted by Congress, and that Congress need not manifest clearly an intent to extinguish aboriginal title to the specific, designated lands in issue. We accept the government's contention that Congress need not display an intent with regard to individual tracts, but it

---

7. In *United States v. Ritchie,* 58 U.S. (17 How.) 525, 538–40, 15 L.Ed. 236 (1854), the Supreme Court held that Indians had been accorded citizenship by Mexico in 1821.

is settled that Congress must make clear its intent to permit extinguishment as a result of any given piece of legislation. *Santa Fe Pacific,* 314 U.S. at 353–54, 62 S.Ct. at 255. Any actions taken by the executive to extinguish Indian title depend for their efficacy upon Congress's acquiescence. *Southern Pacific Transp. Co.,* 543 F.2d at 689.

The government first relies on the subjection of the aboriginally held lands to the homestead laws. The Act of July 2, 1862, ch. 79, 12 Stat. 503, extended the preemption laws to the Territory of Nevada, and the Homestead Act, ch. 75, 12 Stat. 392 (1862) (repealed 1976), applied to lands subject to preemption. The Preemption Act, however, had been amended in 1838 to except from its provisions lands to which "Indian title" had not been extinguished. Act of June 22, 1838, 5 Stat. 251, ch. 119 (1838). "Indian title" encompasses aboriginal title. *See Santa Fe Pacific,* 314 U.S. at 348–50, 62 S.Ct. at 252–53. Congress in 1891 repealed the preemption law, and applied the homestead laws to all "unappropriated public lands." Act of March 3, 1891, ch. 561, § 5, 26 Stat. 1095, 1098. The Act also provided that nothing in it was to "change, repeal, or modify any agreements or treaties made with any Indian tribes for the disposal of their lands," and that the "disposition of such lands shall continue in accordance with the provisions of such treaties or agreement, except as provided in section 5 of this act." *Id.* at § 10, 26 Stat. at 1099. Section 5 of the Act stated the requirements for proof of improvement and cultivation of individual tracts claimed as homesteads. ▪▪▪ We do not find in these provisions the clear expression of intent that would be required for us to hold that the homestead laws alone extinguished aboriginal Indian title in every state and territory where they were generally applicable. "[A]n extinguishment cannot be lightly implied in view of the avowed solicitude of the Federal Government for the welfare of its Indian wards." *Santa Fe Pacific,* 314 U.S. at 354, 62 S.Ct. at 255. Nor do we think that the administration of the homestead laws by the executive within the aboriginal territory of the Western Shoshone extinguished aboriginal title to all those lands. Indeed it may be that aboriginally held lands do not qualify as "unappropriated public lands," in which case the executive is not entitled to grant homesteads from them. *See Cramer v. United States,* 261 U.S. 219, 234, 43 S.Ct. 342, 346, 67 L.Ed. 622 (1923). Moreover, even authorized land grants to third parties are not inevitably inconsistent with continued Indian rights of occupancy; the grantee may take subject to the Indian rights, which continue until properly extinguished by the United States. *See, e.g., Santa Fe Pacific,* 314 U.S. at 347, 62 S.Ct. at 252; *Buttz v. Northern Pacific R.R.,* 119 U.S. 55, 66, 7 S.Ct. 100, 104, 30 L.Ed. 330 (1886); *Holden v. Joy,* 84 U.S. (17 Wall.) 211, 21 L.Ed. 523 (1872); *Johnson v. McIntosh,* 21 U.S. (8 Wheat.) 543, 574, 5 L.Ed. 681 (1821).[8] In the present case, however, we are not dealing with any lands that the government has granted to third parties under the homestead laws; the Danns lay no aboriginal claims to such lands. It is enough for us to conclude, as we do, that Congress in passing the homestead laws evinced no clear intent to extinguish aboriginal title to Indian-occupied lands not actually subjected to a homestead grant, and that the granting of *some* homesteads within the Indians' aboriginal holdings did not represent a sufficient exercise of dominion over the ungranted lands to effect an extinguishment.

---

**8.** The cases of *Barker v. Harvey,* 181 U.S. 481, 21 S.Ct. 690, 45 L.Ed. 963 (1901), and *United States v. Title Insurance & Trust Co.,* 265 U.S. 472, 44 S.Ct. 621, 68 L.Ed. 1110 (1924), are distinguishable. In both, the Supreme Court upheld the validity of patents issued to third parties as against an Indian claim of pre-existing aboriginal title, but the cases were controlled by a federal statute passed for the purposes of settling land claims in California. Act of Mar. 3, 1851, ch. 41, 9 Stat. 631. The statute required all claims to be presented to a commission within two years and if no claim was presented, the land was to be "deemed, held, and considered as part of the public domain of the United States." *Id.* at § 13, 9 Stat. at 633. The Indian claims were not presented to the commission. The statute clearly evinced an intent to extinguish unpresented claims.

As we have noted above, the homestead laws that were extended to unappropriated public lands in 1891 provided that they did not modify any treaty provisions governing the disposal of Indian lands, and that the treaties continued to govern except insofar as the 1891 act provided for proof of improvement and cultivation of homesteaded land. 26 Stat. at 1099. The Treaty of Ruby Valley, 18 Stat. 689 (1863), which dealt with the lands in issue here, provided in part as follows:

### Article IV.

It is further agreed by the parties hereto, that the Shoshonee [sic] country may be explored and prospected for gold and silver, or other minerals; and when mines are discovered, they may be worked, and mining and agricultural settlements formed, and ranches established whenever they may be required. Mills may be erected and timber taken for their use, as also for building or other purposes in any part of the country claimed by said bands.

Article V of the treaty then described the lands claimed by the Shoshone, and Article VI provided for removal of the Shoshone to a reservation should one be established within the claimed country. In our view, these treaty terms reinforce the conclusion that application of the homestead laws to the Shoshone aboriginal territory did not work an extinguishment of their entire title. While Article IV does contemplate the establishment of mines and ranches within the territory, that provision and the two that follow it make no sense if it is assumed that *all* of the aboriginal territory is lost as soon as one or a few such ranches are established. It is clear that any loss of territory is only so large as the incursion requires, and the Shoshone retain the rest. Thus the treaty agrees, at most, to a piecemeal loss of aboriginal title by specific establishment of mines, mills and ranches. The 1891 homestead law by its own terms did not "change, repeal, or modify any agreements or treaties made with any Indian tribes for the disposal of their lands," except as the 1891 Act provided for the

method of proving improvement and cultivation of tracts actually homesteaded. Act of Mar. 3, 1891, 26 Stat. 1095, 1099. Thus the granting of homesteads by the government could work, at most, an extinguishment of aboriginal title to the actual land granted and no more.

The government next contends that the establishment of the Duck Valley Reservation extinguished aboriginal title to the lands claimed in the Ruby Valley treaty. The government points to Article VI of the Treaty, which provides:

The said bands agree that whenever the President of the United States shall deem it expedient for them to abandon the roaming life, which they now lead, and become herdsmen or agriculturalists, he is hereby authorized to make such reservations for their use as he may deem necessary within the country above described; and they do also hereby agree to remove their camps to such reservations as he may indicate, and to reside and remain therein.

18 Stat. at 690. On April 16, 1877, an Executive Order created the Duck Valley Reservation for the Western Shoshone. 1 C. Kappler, *Indian Affairs Laws and Treaties* 866 (2d ed. 1904). Approximately one-third of the Western Shoshone moved onto the new reservation; the rest did not.

Article VI is of little aid to the government, however, because the Duck Valley Reservation was not created from lands "within the country above described"; that is, it was not within the aboriginal territories described in Article V of the Treaty. The government argues that Article VI nevertheless controls, because the Duck Valley Reservation was for many years *thought* to be within the described territories. We fail to see how that error would render the government's action a compliance with Article VI.

The government further argues that, even if Article VI is inapplicable, it does not describe the exclusive means by which a reservation can be established with the effect of causing an abandonment or extinguishment of aboriginal claims outside of

the reservation. Whether or not that proposition is correct, the government's contention that establishment of the Duck Valley Reservation extinguished aboriginal title is refuted by *United States v. Santa Fe Pacific R.R.,* 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941). In *Santa Fe Pacific,* the Walapai Tribe claimed that the railroad received certain granted lands subject to the tribe's right of occupancy. The Court noted that "[i]f the right of occupancy of the Walapais was not extinguished prior to the date of definite location of the railroad in 1872, then the [railroad's] predecessor took the fee subject to the encumbrance of Indian title." *Id.* at 347, 62 S.Ct. at 252. The Court then dealt with the effect of a congressional statute establishing a reservation for the Walapais and others in 1865. The Court held as follows:

> We search the public records in vain for any clear and plain indication that Congress in creating the Colorado River reservation was doing more than making an offer to the Indians, including the Walapais, which it was hoped would be accepted as a compromise of a troublesome question. We find no indication that Congress by creating that reservation intended to extinguish all of the rights which the Walapais had in their ancestral home. That Congress could have effected such an extinguishment is not doubted. But an extinguishment cannot be lightly implied in view of the avowed solicitude of the Federal Government for its Indian wards. As stated in *Choate v. Trapp,* 224 U.S. 665, 675 [32 S.Ct. 565, 569, 56 L.Ed. 941], the rule of construction recognized without exception for over a century has been that "doubtful expressions, instead of being resolved in favor of the United States, are to be resolved in favor of a weak and defenseless people, who are wards of the nation, and dependent wholly upon its protection and good faith." ... Nor was there any plain intent or agreement on the part of the Walapais to abandon their ancestral lands if Congress would create a reservation. Furthermore, the Walapais did not accept the offer which Congress had tendered.

*Id.* at 353–54, 62 S.Ct. at 255 (footnote omitted). In 1881, however, the Walapais themselves petitioned for a reservation because their ancestral lands were becoming uninhabitable by them. Only then did the Supreme Court find that aboriginal rights in lands that were notoriously claimed by others were extinguished by abandonment upon the establishment of the requested reservation. *Id.* at 356–58, 62 S.Ct. at 256–57. We find no comparable petition in this case, and no clear indication of abandonment. Nor is there any clearer indication of an intent of Congress to extinguish aboriginal title of the Shoshone than there was to extinguish the title of the Walapais by establishment of the Colorado River Reservation in 1865. We conclude that no extinguishment occurred when the Duck Valley Reservation was created.

The final action urged by the government as causing extinguishment of aboriginal title is administration of the lands in question under the provisions of the Taylor Grazing Act, 43 U.S.C. § 315 (1976). The Act, passed in 1934, authorized the Secretary of Interior

> to establish grazing districts ... of vacant, unappropriated, and unreserved lands from any part of the public domain of the United States..., which are not in national forests, [or] Indian reservations ..., and which in his opinion are chiefly valuable for grazing and raising forage crops.

*Id.* Shortly after passage of the Act, the Secretary established the Elko Grazing District which encompasses the lands here in dispute. Pursuant to regulations issued by the Secretary, 43 C.F.R. pt. 4110, a third party was issued a license to graze cattle on those lands.

We cannot agree with the contention of the government that the establishment of grazing districts amounts to the kind of intrusion that would cause a loss of Indian title under Article IV of the Treaty. That Article IV contemplated the establishment of "ranches" within the claimed aboriginal territory is clear from its terms.

We do not believe, however, that the mere issuance of a grazing permit establishes such a "ranch," especially in view of the rule that doubtful terms are to be construed in favor of the Indians. *See, e.g. Carpenter v. Shaw,* 280 U.S. 363, 367, 50 S.Ct. 121, 122, 74 L.Ed. 478 (1930).

The government also contends that cases such as *United States v. Pueblo of San Ildefonso,* 513 F.2d 1383 (Ct.Cl.1975), make clear that inclusion of aboriginal lands within a grazing district under the Taylor Grazing Act extinguishes Indian title. The issue in *San Ildefonso,* however, was *when* a taking occurred of aboriginal lands; the taking itself was not in question.[9] The court made quite clear that when aboriginal title is extinguished over a period of time by a series of encroachments, practical compromises have to be made in choosing a date. The Commission rationally chose the date on which the lands were incorporated into a grazing district. 513 F.2d at 1390–92.

Quite a different situation is presented when the dispute is over *whether* aboriginal title has been taken. We do not find in the Taylor Grazing Act any clear expression of congressional intent to extinguish aboriginal title to all Indian lands that might be brought within its scope. We do not find such an expression by implication in the Act's specific exclusion of Indian reservations. Indeed, we question whether aboriginally held lands can properly be characterized as "unappropriated and unreserved lands" forming a "part of the public domain" to which the Taylor Grazing Act applies. *Cf. Ash Sheep Co. v. United States,* 252 U.S. 159, 166, 40 S.Ct. 241, 242, 64 L.Ed. 507 (1920) (lands ceded by tribe to United States under prescribed conditions not public lands available for grazing); *Lane v. Pueblo of Santa Rosa,* 249 U.S. 110, 39 S.Ct. 185, 63 L.Ed. 504 (1919) (lands beneficially owned by Pueblo not public lands). In any event, in the absence of a clear expression of congressional intent to extinguish title, the granting of a patent by the government and the acceptance of leases from that patentee have been held not to extinguish aboriginal title, *Cramer v. United States,* 261 U.S. 219, 234, 43 S.Ct. 342, 346, 67 L.Ed. 622 (1923), and the same rule has been applied to other grants, *e.g., Buttz v. Northern Pacific R.R.,* 119 U.S. 55, 7 S.Ct. 100, 30 L.Ed. 330 (1886); *Johnson v. McIntosh,* 21 U.S. (8 Wheat.) 543, 574, 5 L.Ed. 681 (1821). The grantee in such cases takes subject to the Indian right of occupancy. *Id.* We see no reason why the far more equivocal act of granting a grazing permit should effect an extinguishment.

The government cites *United States v. Gemmill,* 535 F.2d 1145 (9th Cir.), *cert. denied,* 429 U.S. 982, 97 S.Ct. 496, 50 L.Ed.2d 591 (1976), as establishing that inclusion of aboriginal lands within a national forest extinguishes aboriginal title. It argues that such action is analogous to inclusion of lands within a grazing district. We do not agree that the multiple uses to which the government puts a national forest find an adequate comparison in the single use to which a grazing district is put. More important, however, is the fact that *Gemmill* did not rely solely on inclusion within a national forest as the event causing extinguishment. The Pit River Indians had been forcibly removed from the land by military action some hundred years before the decision. The court stated that "continuous use of the land to the present time for the purposes of conservation and recreation, *after the Indians had been forcibly expelled,* leaves little doubt that Indian title was extinguished." *Id.* at 1149 (emphasis added). The court then added that any remaining ambiguity was resolved by final payment of a claim for extinguishment of title. In summarizing, the court noted that "[a]ny one of these actions, examined in

---

9. Similarly, the comment of the Supreme Court in *Northwestern Bands of Shoshone Indians v. United States,* 324 U.S. 335, 346, 65 S.Ct. 690, 696, 89 L.Ed. 985 (1945), that the United States had administered Shoshone lands "as though no Indian land titles were involved" must be understood in context. There was no dispute before the Court as to the fact of taking. The only issue was whether the Indians had previously enjoyed "recognized" title to the lands taken.

isolation, may not provide an unequivocal answer to the question of extinguishment." *Id.* We cannot therefore draw from *Gemmill* a rule that mere inclusion of aboriginal lands still held in Indian occupancy within a grazing district serves to extinguish Indian title. We reject such a rule here. Nor do we find the combination of circumstances relied upon by the government to show extinguishment in this case comparable to that in *Gemmill,* where one of the circumstances was removal of the Indians from their lands by force of arms.

## CONCLUSION

We hold that the Danns are not barred by the doctrines of res judicata or collateral estoppel, or by the bar of 25 U.S.C. § 70u, from asserting aboriginal title as a defense to the claim of trespass in this case. The judgment of the district court is accordingly reversed. We further hold that the district court did not err in ruling that aboriginal title had not been extinguished as a matter of law by application of the public land laws, by creation of the Duck Valley Reservation, or by inclusion of the disputed lands in a grazing district and issuance of a grazing permit pursuant to the Taylor Grazing Act.

In the pretrial order and in its supplemental memorandum filed with the district court on September 5, 1979, the government preserved for trial the factual issues of whether aboriginal title had been preserved to the date of trial and whether the Danns are entitled to share in it.[10] Those matters remain for determination in further proceedings in the district court.

REVERSED AND REMANDED.

---

10. The existence of aboriginal title is in every case a question of fact. *United States v. Santa Fe Pacific R.R. Co.,* 314 U.S. 339, 345, 62 S.Ct. 248, 251, 86 L.Ed. 260 (1941). In the case before us, however, the federal government admitted the historical existence of aboriginal title when it stipulated in the pre-trial order that in 1848 the lands at issue "were part of a vast area exclusively used and occupied by the Western Shoshone." In any event, the government did not preserve any question of the historical existence of such title for determination at trial.