**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Mary DANN; Carrie Dann,
Defendants–Appellees.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Mary DANN; Carrie Dann,
Defendants–Appellants.**

Nos. 86–2835, 86–2890.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 15, 1987.

Decided Jan. 11, 1989.

As Amended on Denial of Rehearing
April 27, 1989.

Robert L. Klarquist, Dept. of Justice, Washington, D.C., for plaintiff-appellant.

John D. O'Connell, Salt Lake City, Utah, for defendants-appellants.

Before FLETCHER, POOLE and CANBY, Circuit Judges.

CANBY, Circuit Judge:

This case is before us once again, this time in the aftermath of a remand from the Supreme Court in *United States v. Dann,* 470 U.S. 39, 105 S.Ct. 1058, 84 L.Ed.2d 28 (1985). Because the parties strongly disagree over which issues remain open for our decision, we must describe, as briefly as we can, what has gone before. It is not a short story.

*History of the Litigation*

This litigation began in 1974, when the United States filed a complaint against Mary and Carrie Dann alleging that they had trespassed on public lands by grazing their cattle there without a permit from the Bureau of Land Management. The government sought an injunction and damages. The Danns defended on the ground that they were members of the Western Shoshone Tribe of Indians, and that the Western Shoshone held aboriginal title to the land in question.[1]

The government responded with two contentions: (1) that the aboriginal title of the Western Shoshone had been extinguished, and (2) that the extinguishment had been conclusively established in proceedings before the Indian Claims Commission. The district court accepted the second contention and granted judgment for the government. On appeal, we reversed. *United States v. Dann,* 572 F.2d 222 (9th Cir.1978) (*Dann I*). We held that the decision of the

---

1. The Danns initially claimed treaty-recognized title as well, but this claim was later abandoned.

*See United States v. Dann,* 706 F.2d 919, 922 n. 1 (9th Cir.1983).

Indian Claims Commission was not yet final, and that the bar and merger of res judicata could therefore not yet apply. *Id.* at 225. We also held that issue preclusion could not apply because the question of extinguishment had not been litigated in the title phase of the claims proceeding. *Id.* at 226.

While the case was pending in the district court on remand, the claims proceeding came to an end. Certain aspects of that proceeding have a crucial effect on this trespass case. The claim was brought before the Indian Claims Commission in 1951, by the Temoak Band on behalf of the Western Shoshone identifiable group. It was brought pursuant to the Indian Claims Commission Act, Ch. 959, 60 Stat. 1049 (1946) (codified as amended at 25 U.S.C.A. §§ 70–70v (1963 and Supp.1982))., which granted the Commission jurisdiction to render damage awards for the taking of aboriginal title, among other wrongs. Its jurisdiction encompassed claims arising on or before August 13, 1946.

In 1974, a group of Western Shoshone, including the Danns, attempted to intervene in the claims proceedings to remove from the claim certain lands that they contended had never been taken. The lands in issue in this case are among them. The Commission rejected the intervention, and the Court of Claims affirmed, viewing the dispute as an internal one among the Western Shoshone over litigation strategy. *Western Shoshone Legal Defense & Educ. Ass'n v. United States,* 531 F.2d 495, 209 Ct.Cl. 43, *cert. denied,* 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976). In 1976, the Temoak Band itself changed its strategy and moved for a stay of the claims proceedings in order to seek an administrative declaration that the Western Shoshone still had title to approximately 12 million acres that they originally had claimed to have been taken. The Commission denied the motion and entered its final award. The Temoak Band appealed the denial of the stay, and the Court of Claims affirmed, primarily on the ground that the motion for the stay had been untimely. *Temoak Band of Western Shoshone Indians v. United States,* 593 F.2d 994, 219 Ct.Cl. 346,

*cert. denied,* 444 U.S. 973, 100 S.Ct. 469, 62 L.Ed.2d 389 (1979). The Clerk of the Court of Claims then certified the award of approximately $26 million to the General Accounting Office.

The final action of the Court of Claims came after our decision in *Dann I* but before the district court had acted on remand. Informed of the termination of the claim proceedings, the district court again entered judgment for the government, holding that the certification of the award extinguished aboriginal title to the Western Shoshone lands.

On appeal, we again reversed the district court. *United States v. Dann,* 706 F.2d 919 (9th Cir.1983) (*Dann II*). We adhered to our ruling in *Dann I* that the issue of extinguishment had not been actually litigated in the claims proceedings, but had simply been assumed. We held that merger and bar under common law rules of res judicata were supplanted by the statutory bar of § 22(a) of the Indian Claims Commission Act, ch. 959, 60 Stat. 1049, 1055 (1946) which provides in part:

> The payment of any claim ... shall be a full discharge of the United States of all claims and demands touching any of the matters involved in the controversy.

We held that this statutory bar did not apply because we concluded that the claim had not yet been paid. The Claim had been certified, an automatic appropriation had followed under 31 U.S.C. § 724a (Supp. III 1979), and the amount of the award had been credited to a Treasury account for the benefit of the Western Shoshone. Despite these facts, and acknowledging the question to be a close one, we held that payment had not been made because further congressional approval would be required for actual distribution of the funds. *Dann II,* 706 F.2d at 925–26.

Having ruled the statutory bar inapplicable, we went on to hold that aboriginal title had not been extinguished as a matter of law by the application of public land laws (including the homestead laws) or the Taylor Grazing Act to aboriginal lands, or by

the establishment of the Duck Valley Reservation. *Dann II*, 706 F.2d at 928–33.

The government asked the Supreme Court to review our ruling that the statutory bar did not apply because "payment" had not been made. The Supreme Court reversed our decision. *United States v. Dann*, 470 U.S. 39, 105 S.Ct. 1058, 84 L.Ed. 2d 28 (1985). The Court's unanimous opinion stated:

> To hold, as the court below has, that payment does not occur until a final plan of distribution has been approved by Congress would frustrate the purpose of finality by postponing the preclusive effects of § 22(a) while subjecting the United States to continued liability for claims and demands that "touch" the matter previously litigated and resolved by the Indian Claims Commission.

470 U.S. at 45, 105 S.Ct. at 1062. After thus rejecting our interpretation of the statutory bar, the Supreme Court added:

> The Danns also claim to possess individual as well as tribal aboriginal rights and that because only the latter were before the Indian Claims Commission, the "final discharge" of § 22(a) does not bar the Danns from raising individual aboriginal title as a defense in this action. Though we have recognized that individual aboriginal rights may exist in certain contexts,[14] this contention has not been addressed by the lower courts and, if open, should first be addressed below. We express no opinion as to its merits.
> 14. *Cramer v. United States*, 261 U.S. 219, 227 [43 S.Ct. 342, 344, 67 L.Ed. 622] (1923); *United States v. Santa Fe Pacific R. Co.*, 314 U.S. 339, 357–358 [62 S.Ct. 248, 256–257, 86 L.Ed. 260] (1941); see generally Cohen, Original Indian Title, 32 Minn.L.Rev. [28], 53–54 [1947].

470 U.S. at 50, 105 S.Ct. at 1064–65. Upon receiving the mandate of the Supreme Court, we remanded to the district court for further proceedings consistent with the Supreme Court's opinion.

In the district court, the government moved for a preliminary injunction. The court, after hearing evidence, combined the motion with one for a permanent injunction and entered final judgment largely favoring the Danns. The court found as facts that the lands in question had been aboriginal lands of the Western Shoshone, and that the Shoshone occupation of those lands had been recognized in the Treaty of Ruby Valley, 18 Stat. 689 (1869). It found that in the 1920's, defendants' father, Dewey Dann, had begun herding livestock on the open range in Crescent Valley, Nevada. In the 1930's,[2] Dewey and his wife, Sophie Dann, obtained a homestead patent to 160 acres and subsequently purchased one section from the Southern Pacific Railroad. The Danns' ranch is currently located on those tracts. When adjacent lands were incorporated into a grazing district under the Taylor Grazing Act, Dewey Dann inquired whether he was required to obtain grazing permits and pay grazing fees for his stock. According to the district court's findings, Dewey was erroneously advised that he must obtain permits and pay fees, and he did so from 1936 until his death. His operation, carrying the " '29' " brand, has since passed to the defendants.

The district court also found that in the 1940's, defendant Mary Dann began herding stock in the area, and was joined by her sister, Carrie, in the 1950's. This operation carried the "3M" brand. As of 1979, the 3M operation was grazing 598 head of cattle, plus calves, and 840 head of horses, plus foals, "on Western Shoshone ancestral lands within the boundaries of the 1863 Treaty of Ruby Valley." Defendants have neither sought nor obtained permits for the 3M operation. Other ranches also ran stock, under grazing permits, on lands used originally by Dewey Dann as well as those used by the 3M operation.

In its conclusions, the district court ruled that the aboriginal title of the Western Shoshone had not been extinguished prior to December 19, 1979, the date that the claims award became final. It ruled that the claims judgment precluded the Danns from asserting the Western Shoshone ab-

---

**2.** The district court found that Dewey and Sophie Dann obtained their homestead patent "in the 1930's." The government asserts that the patent was issued in 1928.

original title, but that the Danns had established individual aboriginal title, prior to 1979, to the exclusive occupancy of one section of grazing land. The district court further held that Dewey Dann had established aboriginal individual rights to graze 170 head of cattle, plus calves, and 10 head of horses, plus foals, and that Mary and Carrie Dann had established individual aboriginal rights to graze 598 head of cattle, plus calves, and 840 head of horses, plus foals, all such grazing rights to be held in common with permittees of the Bureau of Land Management on the lands in dispute. The aboriginal grazing rights were not to be subject to regulation by the Bureau.

*This appeal*

Both parties now appeal the district court's decision and injunction. The government appeals the ruling that the Danns have established individual aboriginal rights to exclusive occupancy of one section and grazing rights in other sections. The Danns appeal the district court's interpretation of the effect of the claims award. They also contend that the district court erred in limiting the Danns' grazing rights to the numbers and species of stock that they grazed in 1979. Finally, the Danns contend that the district court improperly proceeded to final judgment, denying the Danns' request for an opportunity to present further evidence. For the most part, we agree with the government's view of the case. We conclude that the decision of the district court must be reversed.

*Tribal aboriginal title*

■ We would have thought that the Supreme Court's decision would have shifted the focus of this case away from tribal aboriginal title and placed it squarely on individual aboriginal title. The Danns continue, however, to rely heavily on Western Shoshone aboriginal title. A great deal of their argument on this appeal is devoted to an attack on the claims proceedings and to an attempt to limit the effect that the claims award must be given under the Supreme Court's decision in this case. The Danns concede, as they must, that the statutory discharge and merger provision of

§ 22(a) of the Act, ch. 959, 60 Stat. 1049, 1055 (1946), now applies to all claims touching upon the Western Shoshone aboriginal title controversy. Yet they accord the claims decision very little effect. The Danns state:

The issue, then, is what effect "full discharge" had upon the unextinguished and unabandoned Western Shoshone title to lands which were being used and occupied openly, notoriously and continuously by Western Shoshone Indians at the time the discharge occurred.

Danns' brief p. 24. The Danns then go on to argue that a statutory bar does not affect one who is in possession asserting a defense to trespass.

It is true that the Supreme Court's opinion was largely confined to the point that a claim that was certified, appropriated and credited to a tribal account in the Treasury was "paid" within the meaning of § 22(a) of the Act, ch. 959, 60 Stat. 1049, 1055 (1946). But the Court's discussion did not take place in a vacuum; it was a ruling in this very case where the issue was whether § 22(a) barred the Danns' defense to the government's trespass claim. The Supreme Court's opinion was not advisory.

In our opinion in *Dann II*, we had referred to our earlier case of *United States v. Gemmill*, 535 F.2d 1145, 1149 (9th Cir.), *cert. denied*, 429 U.S. 982, 97 S.Ct. 496, 50 L.Ed.2d 591 (1976), "where we ruled that payment of a claim removed any ambiguity that title had previously been extinguished." *Dann II*, 706 F.2d at 925. We distinguished *Gemmill* on the ground that payment had been distributed in that case, so there had been no need to rule on whether mere appropriation constituted payment. Now that the Supreme Court has made it clear that the Western Shoshone claim has been paid, we cannot avoid the rule of *Gemmill* that payment for the taking of a aboriginal title establishes that that title has been extinguished. Even without *Gemmill*, however, we would be directed by the negative implications of the Supreme Court's closing instructions in *Dann*. The Court remanded the question of individual aboriginal title in response to

the Danns' argument "that because only [tribal aboriginal rights] were before the Indian Claims Commission, the 'final discharge' of § 22(a) does not bar the Danns from raising individual aboriginal title as a defense in this action." The Supreme Court's language makes little sense unless § 22(a) bars a defense based on tribal aboriginal rights.

Moreover, the Danns' contention that the lands they occupy were not subject to the claims proceeding was rejected in that litigation. As we stated earlier, the attempt of the Danns and others to intervene was rejected, and the rejection was upheld on appeal. *Western Shoshone Legal Defense & Educ. Ass'n v. United States*, 531 F.2d 495, 209 Ct.Cl. 43, *cert. denied*, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976). A similar contention belatedly asserted by the Temoak Band was similarly rejected. *Temoak Band of Western Shoshone Indians v. United States*, 593 F.2d 994, 219 Ct.Cl. 346, *cert. denied*, 444 U.S. 973, 100 S.Ct. 469, 62 L.Ed.2d 389 (1979). The Danns attack the fairness and constitutionality of these rulings, but they overlook the fact that the interest they assert in tribal aboriginal title is not a direct property interest of their own. *See* F. Cohen, *Handbook of Federal Indian Law* 183–84 (1942). The Danns were simply part of a litigating group with regard to the claims proceeding, and litigation strategy was subject to group decision.

The Danns rely on *Osceola v. Kuykendall*, No. 76–492 (D.D.C. Mar. 11, 1977), *excerpted at* 4 Indian L.Rep. F–80,[3] in which one of a group of Seminoles in possession of lands in Florida attacked a claims proceeding that was adjudicating a claim for the taking of all Seminole aboriginal title in that state. The district court rejected the attack as premature, stating that the plaintiff's possession had not yet been disturbed and that his group's "right of possession and occupancy will not be affected by the [claims] judgment." *Id.* at F–82. We do not read the district court's memorandum opinion as clearly holding that members of a tribe in possession when that tribe's title is extinguished nevertheless retain a tribal right of occupancy. The district court appeared to be leaving open the possibility that plaintiff could demonstrate that his group as an entity separate from the Seminole Nation possessed their land from time immemorial, and therefore had their aboriginal title. *See id.* If, contrary to our understanding, the district court in *Osceola* meant that tribal members occupying tribal land after the tribe's title was extinguished could still assert that tribe's title, the ruling is flatly inconsistent with the Supreme Court's decision and mandate in *Dann*. Conflict or not, we are naturally bound to follow the Supreme Court's direction that the Danns cannot assert Western Shoshone title as a defense to the government's trespass claim.

We reject, therefore, the Danns' attempt to continue to rely on the defense of tribal aboriginal title.[4] That leaves for decision the question whether the Danns may successfully claim individual aboriginal title.

*Individual aboriginal title*

■ Individual aboriginal title is by no means a well-defined concept. The common view of aboriginal title is that it is held by tribes. *See, e.g., Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 667, 94 S.Ct. 772, 777, 39 L.Ed.2d 73 (1974). Among the most important protections of aboriginal title were the Trade and Intercourse Acts, which invalidated transfers of title from *tribes* without the approval of the United States. *E.g.*, 25 U.S.C. § 177 (1983). Thus individual Indians do not even have standing to contest a transfer of tribal lands on the ground that the transfer violated that statute. *James v. Watt*, 716 F.2d 71 (1st Cir.1983), *cert. denied*, 467 U.S. 1209, 104 S.Ct. 2397, 81 L.Ed.2d 354 (1984). Nevertheless, the Supreme Court has pointed out in *Dann* that it has "recog-

---

**3.** A full report of the district court's opinion in *Kuykendall* was submitted by the Danns as a separate appendix.

**4.** In connection with our rejection of their claims based on tribal aboriginal title, we also reject the Danns' contention that the district court erred in denying their request for an opportunity to present additional evidence. The evidence the Danns sought to introduce was in support of their claim of tribal aboriginal title.

nized that individual aboriginal rights may exist in certain contexts," *Dann*, 470 U.S. at 50, 105 S.Ct. at 1065. We therefore consider the possible nature and scope of such an individual title.

■ There is no theoretical reason why individuals could not establish aboriginal title in much the same manner that a tribe does. An individual might be able to show that his or her lineal ancestors held and occupied, *as individuals*, a particular tract of land, to the exclusion of all others, from time immemorial, and that this title had never been extinguished.[5] *Cf. United States v. Santa Fe Pac. R. Co.*, 314 U.S. 339, 345, 62 S.Ct. 248, 251, 86 L.Ed. 260 (1941) (exclusive occupation of ancestral home by Walapai Tribe would establish aboriginal, or "Indian," title).

■ Whether any such individual aboriginal title has existed or could exist, we need not decide, for it is clear that the Danns make no such individual claim to these lands from time immemorial. In their answer to the trespass complaint, the Danns pleaded that the lands in issue were beneficially owned "by the defendants and other members of the Western Shoshone Tribe," and requested a declaration that "the Western Shoshone tribes of Indians are the recognized beneficial owners of the land." In their brief on this appeal, the Danns disavow any claim of individual possessory interests; they assert only tribal interests of the Western Shoshone Nation or the Dann Band of the Western Shoshone. Danns' brief p. 25 n. 24. Indeed, the Danns' entire attack on the claims proceeding is directed toward rescuing the aboriginal title of the Western Shoshone to these lands from the effect of the claims award. Finally, the findings of the district court state that the lands in question are "within the area exclusively used and occupied by the Western Shoshone Nation at the time [of] the Treaty of Guadalupe–Hidalgo," when the territory was acquired by the United States from Mexico. The findings further state that, in exercising their grazing rights, both Dewey Dann and Mary and Carrie Dann were asserting the rights of the Western Shoshone Nation to their aboriginal lands.

It is beyond question, then, that the aboriginal rights to these lands were tribal until they were extinguished. As individual tribal members occupying land under tribal original title, the Danns or their lineal ancestors could assert no rights excluding the tribe or its members from the land they were occupying. *See* F. Cohen, *Handbook of Federal Indian Law* 183 (1942); *F. Cohen's Handbook of Federal Indian Law* 605–06 (1982). And because the rights they assert are tribal, the Danns could just as easily lay claim to any of the 22 million acres of aboriginal Western Shoshone land in Nevada as they do to the tracts at issue in this case. The problem with the claim, as we have already pointed out, is that the Western Shoshone have been paid for that title, and it must be deemed extinguished. When tribal title has been extinguished and paid for pursuant to the Indian Claims Commission Act, we cannot view the remnants of that tribal title as surviving thereafter in individual tribal members. Any such notion would be contrary to the intent of Congress finally to determine tribal land claims and to protect the United States from continued liability for claims that "touch" the matter litigated before the Claims Commission. Indian Claims Commission Act, ch. 959, 60 Stat. 1049, 1055 (1946); *see United States v. Dann*, 470 U.S. 39, 45, 105 S.Ct. 1058, 1062, 84 L.Ed.2d 28 (1985).

There is another possible and much narrower meaning of individual aboriginal title, however. It can be derived from the most relevant case cited by the Supreme Court at the end of its opinion in *Dann.* The case is *Cramer v. United States*, 261 U.S. 219, 43 S.Ct. 342, 67 L.Ed. 622 (1923), and the individual Indian title it protected

---

5. We reject the government's argument that aboriginal title can never be asserted against the government. Aboriginal title can be extinguished only by Congress or with the authorization of Congress. *Dann II*, 706 F.2d at 928–29.

If an executive official or agency attempts to extinguish aboriginal title without any congressional authorization, the titleholder must be able to protect the title by asserting it against the official or agency.

was not aboriginal in the usual sense of long or indefinite duration.

In *Cramer*, three Indians had occupied some 175 acres of public land since shortly before 1859. In 1866, the United States granted land that included the 175 acres to a railroad, with an exception for any of the land "found to have been granted, sold, reserved, occupied by homestead settlers, preempted, or otherwise disposed of." *Id.* at 225 & n. 1, 43 S.Ct. at 343 & n. 1. In 1904, a patent to the disputed land was issued to the railroad. Subsequently, the three Indians brought suit to cancel the patent. At the time the Indians had settled on the land, Indians were not eligible to acquire public land by entry and settlement under the homestead or other land laws. The Supreme Court stated, therefore, that the lands could not be viewed as having been sold or granted; the question was whether they had been " 'reserved ... or otherwise disposed of.' " *Id.* at 227, 43 S.Ct. at 344. The Court then pointed out that it had always been the policy of the government to respect the Indian right of occupancy, and added:

> It is true that this policy has had in view the original nomadic tribal occupancy, but it is likewise true that in its essential spirit it applies to individual Indian occupancy as well; and the reasons for maintaining it in the latter case would seem to be no less cogent, since such occupancy being of a fixed character lends support to another well understood policy, namely, that of inducing the Indian to forsake his wandering habits and adopt those of civilized life. That such individual occupancy is entitled to protection finds strong support in various rulings of the Interior Department, to which in land matters this Court has always given much weight.

*Id.* The Court then held the Indians entitled to the 175 acres they had actually occupied and enclosed, but not to the entire subdivided tract, as the circuit court had held. *Id.* at 234–36, 43 S.Ct. at 346–47.

■ It is apparent from the passage quoted above, and from other statements in the opinion, that the decision in *Cramer*

was based on the Court's view that recognition of title was consistent with federal land and Indian policy of the time. From this fact, the government contends that once the homestead laws were extended to Indians in 1875, Act of March 3, 1875, ch. 131, 18 Stat. 402, 420 (1875), no Indian could obtain title to more land by entry than was permitted under the homestead acts. Because Dewey Dann obtained fee title to 160 acres under the homestead act, the argument goes, he could acquire no more by occupancy.

We do not accept the government's contention limiting the quantity of land that may be individually acquired under the rule of *Cramer*. The nature of the title recognized by *Cramer* appears to be more fragile than that obtained under a homestead patent. While the *Cramer* opinion does not so state, it appears that the Indians' occupancy title was subject to extinguishment by the United States, as is other Indian "aboriginal" title. The decree of the district court in *Cramer*, which was affirmed in relevant part by the Supreme Court, directed the railroad not to interfere with the Indians' occupation so long as they remained on the land "or until the United States shall otherwise direct." *United States v. Cramer*, No. 398 (N.D. Cal.1920), appended to government's brief. It does not follow that a limitation of 160 acres of fee land obtainable under the homestead laws is applicable to the different and extinguishable estate resulting from Indian occupancy. Indeed, the 175 acre tract of the Indians in *Cramer* appears to have exceeded the 160 acre limit that would have been applicable under the 1862 Homestead Act if it had applied. *See* Act of May 20, 1862, ch. LXXV, 12 Stat. 392 (1862).

There is a larger point to the government's argument, however. *Cramer* was built upon the government's policy, at the time, favoring land settlement in general and Indian occupancy in particular. The Court stated that the Indians' right of occupancy "flows from a settled governmental policy" of recognizing pre-existing rights in public lands (including non-Indian rights)

even though they were not perfected. *Cramer*, 261 U.S. at 229, 43 S.Ct. at 344.

In our opinion the possession of the property in question by these Indians was within the policy and with the implied consent of the Government.

*Id.* at 230, 43 S.Ct. at 345. This implied consent arose from a background of homestead acts designed to encourage entry and settlement on vacant government lands. Those laws were extended to non-tribal Indians in 1875, Act of March 3, 1875, ch. 131, 18 Stat. 402, 420, and to all Indians in 1884, Act of July 4, 1884, ch. 180, 23 Stat. 76, 96 (1884). These extensions did not, in our view, preclude acquisition by Indians of non-statutory rights of occupancy; there is certainly no hint in the *Cramer* opinion that it dealt with a right no longer capable of arising. The statutes favoring entry and settlement, like the provisions for Indian allotments on unappropriated public lands, *see* 25 U.S.C. §§ 334, 336 (1983), were nevertheless fundamental to the Court's conclusions in *Cramer*.

The policy of public land settlement that underlay *Cramer* no longer exists. In 1934, Congress departed from its prior policy favoring entry and settlement of unappropriated public lands. The Taylor Grazing Act, 43 U.S.C. §§ 315–315r (1986), authorized the Executive to establish grazing districts that had the effect of withdrawing unappropriated public lands from settlement. In 1934, the President withdrew public lands in twelve states, including Nevada, from entry and settlement. Exec. Order No. 6910 (1934). All lands in twelve additional states were withdrawn in 1935. Exec. Order. No. 6964 (1935). Lands are not available for homestead or allotments for Indians unless the Secretary of Interior classifies the land for that purpose. 43 C.F.R. §§ 2400.0–3 (1986); *see Hopkins v. United States*, 414 F.2d 464, 470–72 (9th Cir.1969). An Indian who settles the land cannot acquire an allotment if the Secretary has not so designated; he is a mere trespasser under current law. *See Kale v. United States*, 489 F.2d 449 (9th Cir.1973), *cert. denied*, 417 U.S. 915, 94 S.Ct. 2617, 41 L.Ed.2d 220 (1974).

In short, an Indian cannot today gain a right of occupancy simply by occupying public land, as the Indians did in *Cramer*. Under current law, that occupancy could not be viewed as undertaken with the implied consent of the government, as was the occupancy in *Cramer*. We therefore conclude that any individual occupancy rights acquired by the Danns must have had their inception prior to November 26, 1934, the date that the lands in question were withdrawn from entry by Executive Order No. 6910.

The district court made no findings concerning whether any of the Danns had established occupancy of the disputed tracts prior to November 26, 1934, because the district court viewed the pivotal date as December 19, 1979, when the Western Shoshone claim was paid.

*When tribal title was extinguished*

The district court erred in ruling that the Western Shoshone aboriginal title had not been extinguished until 1979. As we pointed out in *Dann II*, the claims award could not itself extinguish the title. *Dann II*, 706 F.2d at 928. The Claims Commission had no jurisdiction to extinguish title on its own authority; it simply had jurisdiction to award damages for takings or other wrongs that occurred on or before August 13, 1946. Indian Claims Commission Act, ch. 959, 60 Stat. 1049, 1050 (1946) (as amended Pub.L. 93–494, § 2, 88 Stat. 1499, 1499–1500 (1974)). The extinguishment of tribal title must be deemed to have occurred no later than that date.

The government argues that the most appropriate date for the extinguishment of tribal title to the lands in question is the date stipulated by the parties to the claims proceeding for the valuation of all the lands taken: July 1, 1872. We agree that this is the most appropriate date. As the Supreme Court stated in *Dann*, the Indian Claims Commission had entered an order in the claims proceeding holding that "the aboriginal title of the Western Shoshone had been extinguished in the latter part of the 19th century." *Dann*, 470 U.S. at 41–42, 105 S.Ct. at 1060 (citing *Shoshone Tribe*

*v. United States,* 11 Ind.Cl.Comm'n 387, 416 (1962)). It is true that the taking was not actually litigated, *see Dann I,* 572 F.2d at 226; *Dann II,* 706 F.2d at 919 (1983), but the payment of the claims award establishes conclusively that a taking occurred. From the claims litigation, we can only conclude that the taking occurred in the latter part of the nineteenth century.[6]

*The Danns' individual rights of occupancy*

■ Any individual rights of occupancy asserted by the Danns consequently arose long after the tribal aboriginal title of the Western Shoshone to the lands in issue must be deemed to have been extinguished. Dewey and Sophie Dann and their descendants were eligible to enter public unappropriated lands in Nevada prior to their withdrawal from settlement on November 26, 1934, and to acquire an individual right of occupancy on those lands under the rule of *Cramer v. United States,* 261 U.S. 219, 43 S.Ct. 342, 67 L.Ed. 622 (1923). To establish such an individual right of occupancy, the Danns must show actual possession by occupancy, inclosure, or other actions establishing a right to the lands to the exclusion of adverse claimants. *See id.* at 236, 43 S.Ct. at 347 ("This is in accordance with the general rule that possession alone, without title or color of title confers no right beyond the limits of actual possession."). We do not deem it fatal, however, to an individual right of occupancy that the Indian took actual possession under an invalid claim of tribal title. *See Miller v. United States,* 159 F.2d 997, 1005 (9th Cir.1947) (erroneous claim of original Indian title does not defeat right of individual occupancy). With the tribal title extinguished, the individual Indian taking possession may acquire an occupancy right within the rule of *Cramer.*

■ The district court also found that the Danns had an aboriginal and treaty right of user to graze cattle and horses in common with others on specified public lands. *Cramer* itself does not address user rights; it dealt only with a right of occupancy of land and carefully restricted the right to land actually enclosed and occupied by the individual Indians. *Cramer,* 261 U.S. at 234–36, 43 S.Ct. at 346–47. The point of *Cramer,* however, is that it recognizes a national policy of encouraging Indians to adopt domestic pursuits, such as those encouraged by the public land laws regarding settlement. The rule of *Cramer* is not inconsistent with recognition of a grazing right in individual Indians, acquired prior to subjection of the lands in question to the regime of the Taylor Grazing Act. Analogous cases have recognized that prior occupancy by individual Indians may create enforceable preferences under subsequent statutory allotment acts. *See Aguilar v. United States,* 474 F.Supp. 840 (D.Alaska 1979); *Alaska v. 13.90 Acres of Land,* 625 F.Supp. 1315 (D.Alaska 1985); *cf. Miller v. United States,* 159 F.2d 997 (9th Cir.1947) (possession recognized by 1884 statute for government of Alaska). We conclude that the district court was correct in ruling that Dewey and Sophie Dann could and did acquire individual aboriginal use rights to graze cattle and horses on open range lands later incorporated into grazing districts. Any such aboriginal right, however, must have been acquired prior to the withdrawal of the lands from open grazing and their subjection to the regime of the Taylor Grazing Act. The right also must have been continuously ex-

---

**6.** Even if the claims litigation had not militated in favor of a nineteenth century taking date, aboriginal tribal title to these lands could not have continued all the way to August 13, 1946. The last significant federal actions before 1946 that could reasonably have effected a taking were the passage of the Taylor Grazing Act in 1934 and the incorporation of the lands into a grazing district shortly thereafter. The taking would have to be deemed to have occurred by then.

It is true that in *Dann II* we ruled that the passage of the Taylor Grazing Act and the incor-

poration of the land in a grazing district would not extinguish title, *Dann II,* 706 F.2d at 932, but that was before the Supreme Court ruled that the claims award had been paid and that aboriginal title must be deemed extinguished. In *Dann II,* we pointed out that when the issue is the *time* of taking, rather than the *fact,* inclusion in a grazing district may be chosen as fixing the date of extinguishment. *Id.* (Citing *United States v. Pueblo of San Ildefonso,* 513 F.2d 1383, 206 Ct.Cl. 649 (1975)).

ercised since that time. *See United States v. 10.95 Acres of Land,* 75 F.Supp. 841 (D.Alaska 1948) (rights under 1884 statute recognized in *Miller, supra,* lost by lack of continuous occupation).

The district court held that Dewey and Sophie Dann held an aboriginal right to graze 170 head of cattle, plus calves, and 10 horses, plus foals, upon the public domain. It also held that Mary and Carrie Dann had individual aboriginal rights to graze 598 head of cattle, plus calves, and 840 head of horses, plus foals, on public lands. Most of this livestock appears, however, to have been introduced onto public lands well after the lands were subjected to the administration of the Taylor Grazing Act. Dewey Dann's first application for a grazing permit in 1935 sought permission to graze 21 cattle and 79 horses in common with the livestock of other named ranches. To the extent that the district court recognized aboriginal grazing rights for numbers and types [7] of animals beyond those grazed by the Danns at the time the lands were incorporated into grazing districts under the Taylor Grazing Act, it erred.

 We also conclude that the district court erred in ruling that individual aboriginal grazing rights of the Danns were wholly exempt from regulation by the Bureau of Land Management. Even Indian treaty rights, when shared with others on the public lands or waters, are subject to reasonable regulation that is shown to be essential to the conservation of the common resources and does not discriminate against the Indians. *Puyallup Tribe v. Department of Game,* 391 U.S. 392, 398, 88 S.Ct. 1725, 1728, 20 L.Ed.2d 689 (1968); *Antoine v. Washington,* 420 U.S. 194, 207, 95 S.Ct. 944, 951, 43 L.Ed.2d 129 (1975). To that limited extent, the individual aboriginal grazing rights of the Danns are subject to regulation by the Bureau of Land Management.

 The Danns also claimed, and the district court agreed, that they enjoyed grazing rights under the Treaty of Ruby Valley, 18 Stat. 689 (1869). There are two answers to this contention. The first is that the Treaty of Ruby Valley conferred no individual rights; the parties to the Treaty were only the Western Shoshone and the United States. The second is that the Treaty does not refer to grazing rights, but only to lands generally claimed by the Western Shoshone [8]; any grazing rights were simply included by implication in the lands claimed. Tribal title to those lands, however, was the subject of the Western Shoshone claims litigation. Payment of that claim bars the Danns from asserting the tribal title to grazing rights just as clearly as it bars their asserting title to the lands. The district court accordingly erred in holding that the Danns held treaty grazing rights.

*Conclusion*

The decision of the district court is reversed. The individual aboriginal land title of Mary and Carrie Dann is restricted to land that they or their lineal ancestors who preceded them in interest actually occupied prior to November 26, 1934. The individual aboriginal grazing rights of Mary and Carrie Dann are restricted to the number and type of animals grazed by them or by their lineal ancestors who preceded them in interest at the time that the lands in question were incorporated into a grazing district, shortly after the passage of the Taylor Grazing Act in 1934. Because the district court, under its view of the case, made no findings regarding the status of the Dann claims at those determinative times, we remand for such further proceedings as the district court deems necessary to reach the requisite findings and to enter a judgment or decree accordingly. It follows

---

7. In their cross-appeal, the Danns contend that the district court erred in not permitting interchangeability of cattle and horses. They offer no supporting authority and we find no error.

8. The Supreme Court has described the Treaty of Ruby Valley as one of a series that acknowledged the territories claimed by the Shoshones without "recognizing" title so as to establish a property interest compensable under the Fifth Amendment. *Northwestern Bands of Shoshone Indians v. United States,* 324 U.S. 335, 348, 65 S.Ct. 690, 696, 89 L.Ed. 985 (1945).

from what we have said that we deny the Danns relief on their cross-appeal.

No. 2835 REVERSED AND REMAND-ED.

No. 2890 AFFIRMED (Cross–Appeal).