VICTOR WHITEROCK, APPELLANT, *v.* THE STATE OF NEVADA, RESPONDENT.

No. 24308

June 24, 1996                                        918 P.2d 1309

[Rehearing denied December 17, 1996]

*Frederick B. Lee,* Public Defender, Elko County, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Gary D. Woodbury,* District Attorney, *Sherburne M. MacFarlan, III,* Deputy District Attorney, and *Robert J. Lowe,* Deputy District Attorney, Elko County, for Respondent.

## OPINION

*Per Curiam:*

Victor Whiterock, an enrolled member of the Western Shoshone Nation, entered a conditional plea of guilty to one count of killing or possessing animals without a valid tag. The conditional plea, entered pursuant to NRS 174.035(2), reserved his right to appeal certain issues. Whiterock now appeals from the district court's rejection of (1) his claim of exemption from certain state hunting laws and regulations by reason of his status as a Shoshone, and (2) his mistake of law defense.

On August 21, 1992, Officer Colin Perry of the Elko County Sheriff's Office received a telephone call informing him that Whiterock had a dead deer in his possession. After locating Whiterock, Perry saw a rifle in the cab and the body of a deer in the bed of Whiterock's truck. Upon questioning, Whiterock admitted that he did not have a valid tag for the deer, which he had killed and taken from the Humboldt National Forest. Perry

subsequently arrested Whiterock for unlawful possession of a deer without a valid tag pursuant to NRS 501.376.[1]

Whiterock moved to dismiss the charge on the ground that as a Western Shoshone Indian,[2] he possesses an individual aboriginal right to hunt in the Humboldt National Forest. The district court denied Whiterock's motion on the ground that an individual aboriginal hunting right does not exist in law. Thereafter, Whiterock entered his conditional guilty plea pursuant to NRS 174.035(2), which allowed him to preserve for review by this court the defenses of the existence of an individual aboriginal hunting right and mistake of law.

After careful review, we conclude that the asserted defenses are not legally recognizable and therefore affirm the conviction.

Native Americans who occupied the land in this country before the arrival of European settlers acquired legal rights to the land under a theory of aboriginal title. Aboriginal title is tantamount to fee simple except that it does not grant tribes or individual Indians the power to transfer title. Mitchel v. United States, 34 U.S. (9 Pet.) 711, 746 (1835); Johnson v. M'Intosh, 21 U.S. (8 Wheat.) 543, 547 (1823). Aboriginal title basically guarantees the right to occupy the land and exercise the attendant rights of hunting, fishing and gathering on the land.

Over the course of this country's history, some tribes relinquished their rights or defined their rights through treaties with the federal government; other tribes simply lost their lands through the gradual encroachment of settlers. In 1946, Congress passed an act establishing the Indian Claims Commission, which provided a forum for Native Americans to litigate the taking of their lands and the amount of compensation due to the tribes. 25 U.S.C. § 70 (1976). Under the Indian Claims Commission Act, the Commission was empowered to hear and decide land claims. The Act provides that "payment of any claim . . . shall be a full discharge of the United States of all claims and demands touching any of the matters involved in the controversy." *Id.* at § 70u(a) (omitted from the Code in 1978 upon termination of the Commission).

---

[1]NRS 501.376 (1) provides:

> Any person who unlawfully kills or possesses a bighorn sheep, mountain goat, elk, deer, pronghorn antelope, mountain lion or black bear without a valid tag is guilty of a gross misdemeanor.

[2]In this opinion, the term "Indian" is used to refer to American Indians, or Native Americans, who are the aboriginal peoples of North America.

Pursuant to the Indian Claims Commission Act, the Western Shoshone's tribal rights to lands in western Nevada and other states were declared extinguished and $26 million compensation was ordered paid to the Shoshone for full title extinguishment. *Temoak Band of Western Shoshone Indians v. United States*, 593 F.2d 994, 999 (Ct. Cl.), *cert. denied*, 444 U.S. 973 (1979); *Shoshone Nation or Tribe of Indians v. United States*, 11 Ind. Cl. Comm. 387 (1962).

In 1986, the Western Shoshone brought an action against the State of Nevada to enjoin the enforcement of Nevada's fishing and hunting regulations against members of the tribe. *Western Shoshone Nat. Council v. Molini*, 951 F.2d 200, 201 (9th Cir. 1991), *cert. denied*, 506 U.S. 822, 113 S. Ct. 74 (1992). The Shoshone argued that Nevada's wildlife regulations interfered with Shoshone aboriginal and treaty-reserved rights to hunt and fish. *Id.* The federal district court granted summary judgment to the State of Nevada on the basis that the result of the *Shoshone Nation* litigation was that the Shoshone no longer had title to the land in question; therefore, the members of the tribe had no greater rights to use the land than any other citizen. *Id.* at 203. The Ninth Circuit affirmed the district court order, rejecting the Shoshone argument that tribal aboriginal and treaty-reserved hunting and fishing rights survive the extinguishment of title. *Id.* The *Molini* court specifically rejected the argument that the Treaty of Ruby Valley operates as an independent source of hunting and fishing rights. *Id.* The court held that the rights to hunt and fish on the land are among the bundle of rights which are inherent in holding title to the land. *Id.* (citing Oregon Department of Fish and Wildlife v. Klamath Indian Tribe, 473 U.S. 753 (1985)). Therefore, the conveyance of title included hunting and fishing rights, absent express reservation of those rights. *Id.* Similarly, we conclude that where the Shoshone no longer hold title to the property which encompasses the Humboldt National Forest, Whiterock cannot claim any tribal aboriginal right to hunt and fish there.

In *Molini,* the Shoshone raised the issue presently before this court, namely, the survival of *individual* as opposed to *tribal* aboriginal rights. The federal district court refused to consider this issue because the tribe failed to raise it until two and one-half years after the action was filed. *Id.* at 204. The concept of individual aboriginal rights is not well-defined. The only cases recognizing individual aboriginal rights are Cramer v. United States, 261 U.S. 219, 229 (1923) and United States v. Dann, 470

U.S. 39, 50 (1985), and, after remand, United States v. Dann, 873 F.2d 1189, 1199 (9th Cir. 1989).[3]

In *Cramer,* the United States brought suit on behalf of three Indians who sought to invalidate a federal land patent issued to the Central Pacific Railroad Company in 1904. *Cramer,* 261 U.S. at 224-25. The Indians argued that the congressional act in question, which permitted issuance of the land patent, was invalid because they individually occupied and used the land continuously since before the federal government removed the land from settlement in 1859. *Id.* The United States Supreme Court agreed, reasoning that aboriginal title creates an individual aboriginal right of occupancy. The Court concluded that the Indians' right of occupancy was superior to the title vested through a later federal land patent. *Id.* at 225. The Supreme Court grounded its opinion on the contemporary government policy which favored land settlement in general and Indian settlement in particular. The Court stated, "[i]n our opinion the possession of the property in question by these Indians was within the policy and with the implied consent of the Government." *Id.* at 230.

In *Dann,* the United States brought a trespass action against the Danns, members of an "autonomous band of the Western Shoshone," alleging that they had trespassed on public lands by grazing cattle there without a permit from the Bureau of Land Management. *Dann,* 470 U.S. at 43. The Danns defended on the ground that as Shoshones they had aboriginal title to the land in question. *Id.* After a series of lower court opinions, the United States Supreme Court determined that any tribal aboriginal rights were extinguished by the payment to the tribe for the taking. *Id.* at 44. However, the Court also stated, "[t]hough we have recognized that individual aboriginal rights may exist in certain contexts, this contention has not been addressed by the lower courts and, if open, should first be addressed below. We express no opinion as to its merits." *Id.* at 50.

On remand, the district court and then the Ninth Circuit addressed the issues with respect to the Danns' claim of individual aboriginal rights. The Ninth Circuit explained that the indi-

---

[3]Other cases have discussed the concept of individual aboriginal rights, but none have recognized that the litigant was entitled to such a right and none have clearly set forth the parameters of individual aboriginal rights. United States v. Santa Fe Pacific R. Co., 314 U.S. 339, 344-45 (1941); United States v. Kent, 945 F.2d 1441, 1443-44 (9th Cir. 1991); Pai 'Ohana v. United States, 875 F. Supp. 680, 697 (D. Hawaii 1995). In fact, various courts have made contradictory statements regarding individual aboriginal rights. Compare *Pai 'Ohana,* 875 F. Supp. at 697 (*exclusive* use and occupancy required to establish individual aboriginal title) with *Dann,* 873 F.2d at 1199 (*shared* individual aboriginal grazing rights recognized).

vidual aboriginal rights recognized in *Cramer* were much narrower than the traditional tribal aboriginal rights. *Dann,* 873 F.2d at 1196. The court noted that those traditional tribal rights were based on occupation and use since time immemorial. *Id.* at 1197. In *Cramer,* the Indians' rights were based on the fact that they had occupied the land since the time that federal policy encouraged their occupation, and the policy was no longer in effect. *Id.* at 1197-98.[4] The Ninth Circuit concluded, however, that if the Danns could establish that they or their lineal ancestors had actually exercised grazing rights prior to November 1934, when the land was withdrawn from settlement, and had exercised them continuously since that time, the Danns would have established grazing rights for the numbers and types of animals they had grazed at the time the lands were incorporated into grazing districts. *Id.* at 1199-1200. Thus, the individual aboriginal right to graze recognized in *Dann* was narrowly drawn. The Ninth Circuit went on to hold that individual aboriginal grazing rights were not wholly exempt from regulation by the Bureau of Land Management stating that "[e]ven Indian treaty rights, when shared with others on the public lands or waters, are subject to reasonable regulation that is shown to be essential to the conservation of the common resources and does not discriminate against the Indians." *Id.* at 1200 (citing Puyallup Tribe v. Department of Game, 391 U.S. 392, 398 (1968); Antoine v. Washington, 420 U.S. 194, 207 (1975)).

The question before this court is how the federal policy expressed in the foregoing cases corresponds with Whiterock's claim that he holds an individual aboriginal right to hunt in the Humboldt National Forest without any state interference. There are no cases directly on point which would dictate this court's decision. *Cramer* is clearly distinguishable since it involved a claim to land which the individual Indians had enclosed and occupied for years before the federal grant to the railroad. Thus, *Cramer* is very similar to a case of adverse possession. Moreover, in *Cramer,* no tribal lands or rights were involved. Accordingly, *Cramer,* did not address the issue of whether an individual aboriginal right survives after tribal title to the same land is extinguished. Because Whiterock is claiming an individual right to hunt on land to which his tribe once had title, *Cramer* does not

---

[4]In 1934, Congress departed from its earlier policy favoring entry and settlement of public lands by passing the Taylor Grazing Act. Under the Taylor Act, President Franklin D. Roosevelt withdrew unappropriated public lands from settlement in twelve states, including Nevada. Thus, where federal priorities had shifted since *Cramer,* the Danns' occupancy of public land could not be viewed as undertaken with the implied consent of the government as it was in *Cramer. Dann,* 873 F.2d at 1198.

apply. The individual aboriginal rights to graze on public land which *Dann* recognized are much closer in character to the hunting rights asserted in this case. Both claims of rights are based on prior usage and encompass the ability to use public lands free from government regulation unless the government can prove that the regulation is necessary for the conservation of the resource. However, *Dann* can be distinguished in that it involved federal regulation and federal policy, as opposed to state regulation as in this case.

Federal courts have never recognized an *individual* hunting right; all the cases involving hunting rights relate to *tribal* rights. Most cases dealing with hunting and fishing rights involve the interpretation of treaties in which tribes specifically reserved these rights. *See* Antoine v. Washington, 420 U.S. 194 (1975); Washington Game Dept. v. Puyallup Tribe, 414 U.S. 44 (1973); United States v. Oregon, 913 F.2d 576 (9th Cir. 1990).

States have traditionally been accorded wide latitude in fashioning regulations appropriate for protection of the wildlife within their borders, even on federal land, so long as those regulations do not conflict with a federal statute or treaty. *See* Ward v. Race Horse, 163 U.S. 504 (1896). While a number of cases have dealt with the issue of state wildlife regulations and have established limits on the degree to which states may regulate Indian rights, all of these cases are based on the interpretation of treaties. *See* Tulee v. State, 315 U.S. 681 (1942) (limiting state's right to charge fees for fishing licenses); Maison v. Confederated Tribes, 314 F.2d 169 (9th Cir.), *cert. denied,* 375 U.S. 829 (1963) (denying state right to restrict use by Indians unless conservation could not be achieved by restricting use by non-Indians). In the present case, no reserved treaty-based rights exist since the courts have already ruled that all tribal Shoshone rights have been extinguished. Western Shoshone Nat. Council v. Molini, 951 F.2d 200 (9th Cir. 1991), *cert. denied,* 506 U.S. 822, 113 S. Ct. 74 (1992). Furthermore, the *Puyallup* litigation established that even when rights have been reserved under treaty, individual members of the tribe are subject to the jurisdiction of state courts in connection with fishing activities occurring off the reservation. Puyallup Tribe v. Washington Game Dept., 433 U.S. 165 (1977).

In view of the long-standing federal policy of allowing states to regulate wildlife within their borders, and in light of the absence of tribal rights to hunt and fish, we conclude that there is no basis in federal law which would grant Whiterock an individual aborig-

inal right to hunt in the Humboldt National Forest free from regulation by the State of Nevada. *Dann* is distinguishable on the ground that it involved grazing rights, which were based on federal policies. In contrast, the federal policy with respect to wildlife is to defer to the state—there is no overriding federal policy.

Even if Whiterock were able to establish that he or his ancestors had continuously hunted in the forest for their subsistence since 1906[5] (the date that President Theodore Roosevelt reserved the land which became the Humboldt National Forest from settlement), there is no federal policy which would mandate recognition of special rights for individual tribal members in the absence of any such tribal rights.[6] The State's interest in preserving and regulating the wildlife within its boundaries is therefore the overriding valid interest. Whiterock has a right to hunt in Nevada, but he must comply with the reasonable non-discriminatory regulations of the State.

Under state law, Whiterock has a right to hunt in the Humboldt National Forest and elsewhere in Nevada, just as any Nevadan. The only restriction on this right is that hunters must obtain a license or a big game tag. The State even exempts resident Indians, such as Whiterock, from paying a fee to obtain a hunting or fishing license. NRS 502.280(1). This is consistent with this State's recognition of Indian heritage and its respect for Indian culture and tradition.

We also conclude that Whiterock's defense of mistake of law is without merit. It is well established that mistake or ignorance of the law is not a defense to a criminal action. State v. Patterson, 679 P.2d 416, 422 (Wash. Ct. App. 1984); *see* Dixon v. State, 103 Nev. 272, 274, 737 P.2d 1162, 1164 (1987).

Whiterock's conviction is affirmed.

---

[5]Whiterock pleaded guilty to hunting without a license. Thus, there was no trial in this case at which evidence was presented or findings made regarding whether Whiterock and his family continuously hunted on the land.

[6]Even if sympathetic federal policies have sought to redress the historical inequitable treatment of Indians in this country, those policies do not create a right where one does not exist in law.